# Oller *versus* Bonebrake.

1. In a question of advancement before an auditor, one of the parties resisted the admission of a book as the "family book." On an issue to try whether this was the "family book," the same party offered the book in evidence. *Held,* that he was not estopped on account of objecting to it before the auditor.

2. Declarations of a parent contemporaneous with entries of advancements made in his book are evidence.

3. Declarations of a parent to change a debt into an advancement are not admissible.

4. Things shown once to have existed are presumed to continue in the same state till the contrary be established.

5. Where a parent has made large advancements, the presumption is that he continued to intend that on his death intestate they should be brought into the account to divide his estate equally.

6. Entries of advancements were made in a parent's book, an inquest found that he had been lunatic five years before the finding. When the book came into his committee's hands, the entries were found to be cancelled. There was no presumption of law, as to whether the cancellation had been made before or after the lunacy.

7. The burden was on those resisting the advancements, to show a change of intention of the parent when he was sane.

8. Positive and direct evidence for this purpose was not necessary, and the question was for the jury.

9. Upon awarding a feigned issue, the court in allowing interested persons to testify may restrict the points on which they may testify.

[Oller *v.* Bonebrake.]

May 9th 1870.　Before Thompson, C. J., Agnew and Sharswood, JJ.

Error to the Court of Common Pleas of *Franklin county:* No. 87, to May Term 1869.

This was a feigned issue directed, January 16th 1869, by the Orphans' Court to the Court of Common Pleas, to find facts relating to the distribution of the estate of John Hollinger, deceased.

The decedent had been married twice; his children by his first wife were Samuel G.; Mary, wife of John Myers; Ann, wife of John S. Oller; Daniel; Margaret, wife of Jacob Rummel, who died childless in the lifetime of her father; and Christian, another son who left home and had not been heard from for 18 or 20 years and was supposed to be dead. Christian was at that time a single man. In February 1860, John Hollinger married his second wife, and had by her a son Lewis, who was born sixteen or seventeen days after the marriage of the parents. In January 1864, an inquest was awarded to inquire of the lunacy of John Hollinger. The inquest found him a lunatic and that the lunacy had existed for five years prior to the time of the inquest. John S. Oller and Samuel G. Hollinger were appointed his committee. Hollinger died December 6th 1866, intestate.

John S. Oller, his administrator, &c., filed his account, which was confirmed March 26th 1868, by which there appeared to be a balance of $5513.35 for distribution. George Eyster, Esq., was appointed auditor to make distribution.

In the course of the hearings before the auditor, a small book composed of a sheet of writing paper, folded in book form, was produced by the administrators under a *subpœna duces tecum.* This book contained charges against the six children of his first marriage. Through all these charges, except that against Christian, were drawn diagonal black lines as of cancellation. Whether this book was the " family book" of the decedent, was the contention before the auditor; the guardian insisting that it was not. Before the auditor made his report, Nicholas Bonebrake, the guardian of Lewis Hollinger, asked the court to direct an issue between him as guardian, &c., of Lewis Hollinger, plaintiff, and John S. Oller, administrator of John Hollinger, deceased, defendant, to try whether this book was the " family book" of the decedent. The court directed the issue in that form and further ordered, " that J. S. Oller and Samuel G. Hollinger be examined as witnesses in relation to the cancellation of the said charges in the family book of John Hollinger." The declaration in the issue contained four counts, averring that the book was the " family book," averring the charges against each child separately in the several counts " as advancements to them, respectively, on account of their shares of his estate, and to be accounted for at his decease, and that the entries and charges in said book were accurate and true."

The issue was tried February 1st 1869, before Rowe, J.

The plaintiff proved that the entries in the book were in the handwriting of the decedent; they also proved that Christian had left home to go with the army to Mexico in 1846 or 1847; had been heard of as being in California in 1856 or 1857, and had not been heard of since.

The entries in the book were in several items in each case except Christian, which was but one, and were from 1845 to 1856. The amount against Mary Myers was $2369; against Ann Oller $2335; against Daniel $2422; against Samuel $2079; against Christian $500; against Margaret Rummel $2444.

The plaintiff offered to prove in connection with the book, declarations of the decedent about his children and his estate; the offer was objected to because, before the auditor, the guardian had denied that the book was the record of the advancements, and because declarations of the decedent were not competent evidence to prove advancements. The offer was admitted and a bill of exceptions sealed.

Isaac Schockey, a nephew of decedent, testified, that the decedent in 1846 or 1847, a few days after Christian left home, told witness that Christian had taken $400 or $450 of his money; he said he would charge him as he had done his other children; he had commenced making advancements to Samuel, said his children should all have alike; said he had started with $2000 and would go through with that to the other children; what he gave over that amount he would take notes for; this conversation had been before his second marriage; there were other conversations shortly before his insanity.

Margaret Hollinger, the widow, testified, that she had kept house for him for three or four years before their marriage; also as to declarations of decedent that he intended to make his children equal; that he so said after the birth of her child; that she had seen the book but there were then no black lines over the charges. There was evidence that the decedent had given money to some children about the date of the entries in the book.

The plaintiff rested.

Oller and Samuel Hollinger testified that the book came into their hands when they entered upon their duties as committee, and that it was in the same condition as at the trial.

The defendants gave in evidence the proceedings in lunacy; they also gave evidence of declarations of the decedent, that he had made distribution amongst his children, thought it was right he should do so as $3000 of his estate came from their mother.

The plaintiff asked the court to charge:

1. If the jury believe from the evidence that the entries of moneys and other articles in the book offered in evidence are correct, and that John Hollinger charged the children with said

[Oller *v.* Bonebrake.]

moneys and other articles, in the book, at or about the times the same were received, the law presumes that he intended said moneys and other articles to be advancements by him to said children, on account of their shares of his estate after his death.

2. If the jury believe from the book, and the declarations of John Hollinger, that have been testified to by the witnesses, that the moneys and other articles given by John Hollinger to his children, and charged against them in the book, were intended by him as advancements to his children, on account of their shares of his estate after his death, the burden of proof is on the defendant to show the jury, by some clear and satisfactory evidence, that John Hollinger, subsequently by some act of his, changed the advancements into pure gifts.

3. If the defendant relies on the black lines drawn across the book in evidence as proof of a conversion of the advancements into gifts, he must prove by satisfactory evidence that the black lines were made by John Hollinger, when they were so made, under what circumstances and with what intent they were so made. More particularly is this necessary in the present case, because defendant has shown that John Hollinger was insane for several years before his death.

4. There is no evidence before the jury, by whom the black lines were made, nor when they were made, nor with what purpose, and, therefore, the mere existence of the black lines across the book is not sufficient in itself to change the advancements charged in the books into gifts.

The court affirmed all the points, qualifying the 3d by saying, " except as to when and under what circumstances."

The court, after referring to the facts, charged:— * * *

" If, then, you determine that these sums were given by the father to his children by the first wife, you will consider of the next question.

" Was the money so given, given as a present or as an advancement ?   For no one claims that these charges were debts. Now a present is a gift, and so is an advancement; but a present is never at any time to be accounted for, whereas an advancement is a gift to be accounted for by the child, when the father's estate comes to be settled up and distributed.   An advancement is defined to be an irrevocable gift by a parent in his lifetime, to a child, on account of such child's share of his estate, at the parent's death.

" When a father in the circumstances of John Hollinger, gives to a child so large a sum as \$2000 (not as a loan), on the occasion of his leaving home, or to help him along in life, and charges the sum in this way, the presumption of law is that the gift is an advancement, and not a present.   This presumption may be rebutted by evidence of what the parent intended at the time,

[Oller *v.* Bonebrake.]

by evidence that he intended it as a pure gift. But I am bound to say to you, that I see no evidence in this case of such a character, and that in the absence of such evidence, if the children received the sums charged, they received them as advancements." * * *

" But if these sums of money were obtained by these four children of the first wife from their father, and if they were advancements at the time they were given, then there is a further question : Did John Hollinger, by any act of his, subsequently convert these advancements into gifts ? For undoubtedly he had the right and the power to change these advancements, if they are such, into pure gifts or presents. This is a pure question of intention, which must be evidenced, however, by acts or declarations of the parent.

" The counsel for the defendant say, that upon the second marriage of John Hollinger, under the peculiar circumstances of that marriage, he changed his mind, and made the former advancements pure gifts. They say that he then cancelled the charges in the book against the children of his first wife, and thereby evidenced his intention that they should never account for those sums to anybody.

" Now, if John Hollinger in his right mind drew these transverse black lines across these charges, the irresistible inference is that he intended to destroy them as evidences of advancements, to cancel them so that they might not be taken into account in the settlement of his estate. Did he then cancel those charges, and if so, was he sane when he did ?

" There is no direct evidence who cancelled them ; but the books, if you believe the evidence of Hollinger and Oller, his committee, were found by them cancelled just as they now are. If these two gentlemen, his committee, drew those lines, or any other person than Hollinger himself, the cancellation amounts to nothing, of course. How are you to decide this, supposing you to believe the committee ? They came out of John Hollinger's desk from among his papers, and if they were then as they are now, the presumption is that John Hollinger, the father, drew the lines. This is the presumption with which you start—but it is capable of being rebutted by any proper evidence—you will say whether there is any such evidence. The presumption is, perhaps, supported by the fact of a second marriage, and a son born under peculiar circumstances. [But if these charges were originally advancements, it is incumbent upon the defendant to show that Hollinger not only cancelled them but that he did so in his right mind.] Before these papers came into the hands of his committee he was insane a year or two at least. He was married in February 1860. In March 1864, he was declared a lunatic, and

the jury of inquest say that he had been a lunatic four or five years. This is primâ facie so.

"Now one of the strong positions of the defendant is, that in consequence of the second marriage he changed his mind, and made gifts of what had been advancements. But almost if not altogether from the date of the marriage he was insane, according to the finding of the inquest. [If, then, the moneys advanced by the father were advancements and not presents at the time they were given, they must bear that character until proof is brought to show a conversion into some other, and the defendant being the party that alleges such conversion, the burden is upon him to show that the change took place.] [The burden is upon him, then, to make out that Hollinger drew the lines, and that he drew them knowing what he did, in other words, that he was sane when he cancelled the charges. The finding of the inquest throws this obligation upon the defendant, and he must bring evidence enough to satisfy you of Hollinger's sanity when the cancellation was done."] * * *

The verdict was for the plaintiff, and the defendant took out a writ of error.

The errors assigned were :—

1. Restricting the evidence of Oller and Samuel Hollinger in the order for the issue.

2. Admitting evidence of the declarations of the decedent.

3–6. The answers to the plaintiff's points.

7–10. The parts of the charge in brackets.

*F. M. Kimmell* (with him *E. J. Bonebrake* and *W. Adams*), for plaintiff in error.

*J. McD. Sharpe* (with him *J. W. Douglas* and *J. Douglas*), for defendant in error.—An advancement is an irrevocable gift on account of a child's share : Hengst's Estate, 6 Watts 86. The presumption is that receipts from a parent are advancements : Dutch's Appeal, 7 P. F. Smith 461; Murphy *v.* Nathans, 10 Wright 508. Declarations of the parent are evidence to show his intention : Levering *v.* Rittenhouse, 4 Wharton 130 ; King's Estate, 6 Id. 370 ; Miller's Appeal, 4 Wright 57 ; Thompson's Appeal, 6 Id. 345 ; Haverstock *v.* Sarbach, 1 W. & S. 390. If the moneys were originally advancements, they would so continue until changed : Kreider *v.* Boyer, 10 Watts 54. The inquest of lunacy was a legal presumption : Rogers *v.* Walker, 6 Barr 371. A lucid interval must be proved : Gangwere's Estate, 2 Harris 417 ; Willis *v.* Willis, 2 Jones 159 ; Noel *v.* Karper, 3 P. F. Smith 97. The court had the right to restrict the evidence of interested persons in directing the issue : Ringwalt *v.* Ahl, 12 Casey 336.

The opinion of the court was delivered, July 7th 1870, by

SHARSWOOD, J.—The issues framed were very special. It was not a general one, whether John Hollinger had made advancements to any of his children in his lifetime, but whether a small book produced before the auditor was the family book of said Hollinger, and then in four counts separately averring that he had charged each of his four children certain amounts as advancements to them respectively, and that the entries and charges in said book were accurate and true. This small book, made by a sheet of common writing paper folded in that form, contained charges as declared on against each of five children, but they were crossed or cancelled by black lines except one to his son Christian, who not having been heard from for many years, is presumed to be dead. It was called for by the plaintiff below from the custody of the defendants, and being produced it was offered in evidence, in connection with the testimony of a witness of declarations of the decedent about the time of the charges in the book. This was objected to so far as the book was concerned, not because it was a mutilated or cancelled document of which some explanation must be given before it could be admitted, but specifically and solely because the plaintiff in the issue, the guardian of Lewis Hollinger, had before the auditor persistently denied that the book produced was the record of the advancements made by John Hollinger to his children. Such a denial made by the guardian certainly could not estop him from offering the book in evidence, whatever effect it might have with the jury in discrediting the document. The accompanying declarations being cotemporaneous with entries made in the account and admitted to have been in the handwriting of John Hollinger, were clearly competent evidence: Hengst's Estate, 6 Watts 86; Daniel King's Estate, 6 Wharton 370. It was not an attempt to turn what was primâ facie a debt into an advancement by the declarations of a parent made subsequently and in the absence of the child, which would have been inadmissible: Levering *v.* Rittenhouse, 4 Wharton 130; Haverstock *v.* Sarbach, 1 W. & S. 390; Yundt's Appeal, 1 Harris 575; Miller's Appeal, 4 Wright 57. But in truth the paper produced in the handwriting of the intestate did not need the aid of any such parol evidence. The sums were not charged against the children as debts and their amount precluded the idea that they were presents without some testimony to show this affirmatively: Daniel King's Estate, 6 Wharton 370. There was evidence then before the jury, admitted without objection, even if not competent, that John Hollinger at the dates stated in the book, did pay certain sums to his children as advancements.

We start with this, then, as a fact in evidence. Now the rule is a general and reasonable one that things shown once to have existed must be presumed to continue in that state until the con-

[Oller v. Bonebrake.]

trary is established by evidence, either direct or presumptive: Best on Presumptions 186. The principle ought certainly to apply in a case like this in support of the natural and reasonable presumption that a parent, who has made large advancements to his children as such, continued to intend that on his death intestate they should all be brought into account, so that they should share equally in his estate. What was relied on to rebut this otherwise inevitable conclusion was the fact that this document was found on the death of John Hollinger among his papers in a cancelled state. It was contended that this fact by itself was sufficient to evince that there had been a change of his intention by which these advancements were converted into presents. This probably was so, and then, if the evidence in the cause had rested there, the affirmance by the court of the 4th point of the plaintiff below would have been an error. But we must interpret that affirmance by the general charge and the other evidence. In connection with that, the mere existence of the black lines across the book was not sufficient in itself to change the advancements charged in the book into gifts. An inquest upon a commission *de lunatico inquirendo*, produced by the defendants below themselves, found that John Hollinger had been of unsound mind for more than six years before his death. The primâ facie effect of this finding is not a point in dispute. How then did it operate upon the presumption of a change of intention in the decedent? It threw the question open. A paper is produced from the possession of a man *non compos mentis* in a cancelled state. He had an interval and opportunity to cancel it before he became insane, but equal opportunity to do so afterwards. How can it be said that there is any presumption of law one way or the other? The *onus* was still on the defendants below to meet and rebut the clear and incontrovertible, if not uncontroverted, fact that John Hollinger had made large payments to his children while he was of sound mind, intended by him at the time as advancements. They must show a change of that intention at a time when he was of sound mind. The prima facies of the finding by the inquest imposed this upon them. *Stabitur presumptioni donec probetur in contrarium.* It is a mistake, however, to suppose that positive direct and affirmative evidence was necessary for this purpose, or that it was required by any ruling of the learned judge below. It was for the jury under all the circumstances to decide this point. The presumption to be passed upon was one of fact, not of law. Like the case of two persons, perishing in the same calamity, where the question is, which survived, our law recognises no artificial rule of presumption from age or sex, but leaves it to the decision of a jury upon all the circumstances: Best on Presumptions 201. This question, as we understand it, the learned judge below did submit to the jury. He did not take it from them by the instruction that it was incumbent

on the defendants to satisfy them that Hollinger not only cancelled the entries, but that he did so in his right mind. The *onus* we have seen was thrown upon them by the special character of the issues and the course of the testimony. He nowhere instructed them that they might not infer from the evidence that the cancellation took place before the insanity commenced. He said in affirming the plaintiff's 4th point that there was no evidence when the black lines were made nor with what purpose, and therefore their mere existence was not sufficient *in itself* to change the advancements charged in the books into gifts. The reasonable explanation of this answer, which we are bound to give it so as to render it consistent with the charge, is that inasmuch as John Hollinger was shown to have been insane for a long period before his death, and there was no evidence at what time the black lines were drawn, those lines were not of themselves sufficient to rebut the evidence of advancements. Had he answered otherwise it would have thrown the *onus* on the plaintiff, and been a determination of the cause in law in favor of the defendants. If on the other hand he had meant to say that independently of the book itself there was no evidence in the cause from which the jury might infer that John Hollinger had determined to change the advancements into gifts while in a sound condition of mind, it would have been his duty to have so instructed the jury by a binding direction.

There were, however, facts and circumstances bearing upon this question, to some of which the learned judge below adverted in his charge. On the one side were his second marriage, a very short time before he became insane, and a son born a few weeks afterwards. Yet it is not easy to see why we should conclude from that, without more, that he wished to deprive of an equal share of his estate this child whom he acknowledged as his son, and took care to secure his legal *status* as a legitimate child by marrying his mother before his birth. It is true that $3000 he had received from his first wife, the mother of his other children. He gave that as a reason for making the advancements. So far as it went, it would be good. But it would be no reason for dividing between them, out and out, $13,000, to the exclusion of his youngest child, not in being when the advancements were originally made. Instead of drawing black lines over the whole, had there been a credit entered or deduction made of $3000, it would have been a sensible, rational and intelligent act. Perfect self-possession and soundness of mind would have prompted the entire destruction of the document if he had meant to accomplish the result now aimed at, or else to have made a written will. In addition to considerations of this character, conversations between him and his nephew, up to the date of his marriage, a few weeks before his insanity began, showed no change of intention in regard to the advancements,

[Oller *v.* Bonebrake.]

and the testimony of the widow was very positive and express that up to and after the birth of the last child, he spoke of not wishing to make any difference among his children.

The court below in awarding the issue had an undoubted right, in their discretion, as the law then stood, to make the order .that the defendants should be examined as witnesses, and to confine their testimony to the question of the cancellation. They were interested and incompetent witnesses, and therefore they have nothing whereof to complain.

Judgment affirmed.