## Commonwealth ex rel. District Attorney v. Pasquale et al.

*Frank X. Renninger,* District Attorney, for plaintiff.
*Dennis A. O'Neill* and *Darlington Hoopes,* for defendants.

WILLIAMS, J., June 22, 1928.—On the 10th day of last December, under and pursuant to the Act of the General Assembly approved the 27th day of March, 1923, P. L. 34, Frank X. Renninger, district attorney of this county, filed, on behalf of the Commonwealth of Pennsylvania, the plaintiff, a bill in equity praying, first, the grant of the rule upon Enrico Pasquale, the first defendant, and Daniel Rastelli, the second defendant, to show cause why a preliminary injunction should not issue restraining until final hearing the continuance of a common nuisance pleaded in the bill; secondly, the issuance of an order to restrain the defendants and all other persons from removing or in any way interfering with the liquors, beverages, utensils and other property constituting and used in connection with the alleged nuisance; thirdly, the making of an order that the room, rooms, house, building, structure and place and everything else described in the third (3rd) paragraph of the bill should not be occupied for any purpose until final hearing; fourthly, the entry of a decree that no intoxicating liquor be manufactured, sold, offered for sale, bartered, furnished or possessed for beverage purposes in any part of the building, structure or place known as the Seven Stars Hotel, situate in the Township of Plymouth, this county; fifthly, an order of court, upon final hearing, that all intoxicating liquor and all property designed for

the manufacture or sale of intoxicating liquor for beverage purposes in and upon the premises of the Seven Stars Hotel and used or intended to be used in violation of law be deemed contraband and be declared forfeit to the plaintiff; sixthly, a decree that no part of the building, structure or place known as the Seven Stars Hotel should be employed for any purpose whatsoever for one (1) year; and, seventhly and lastly, other and further relief.

A rule to show cause as prayed was granted upon the defendants and made returnable the 16th day of December, but, on the return-day, the rule was continued until the 30th day of the month and, again, until the 27th day of the next January. The second defendant having filed an answer on the 28th day of last December and the first defendant having done so on the 16th day of the following January, when preliminary hearing was at last reached, the case had come to issue. So, by agreement through counsel of the parties appearing of record, the preliminary hearing became a final one. At such hearing, the bill was amended without objection to correct the last name of the first defendant to Di Pasquale.

After hearing the testimony, listening to the arguments of counsel for the plaintiff and on behalf of the defendants, reading the whole record, examining all the requests for findings of fact and conclusions of law and perusing the briefs submitted by counsel for the plaintiff and on behalf of the first defendant—no brief having been submitted by counsel for the second defendant—we make the following

*Findings of fact.*

1. Enrico Di Pasquale, the first defendant, now is and since 1924 has been the owner in fee of the hotel property generally known as and commonly called the Seven Stars Hotel and situate on the southwest side of the Ridge Turnpike Road in the Township of Plymouth, this county. The hotel is the first building east of the overhead crossing by the pike of the railroad tracks of the Plymouth Division of the Reading Company. The road-house is located about two (2) miles from the southeast borough line of Norristown and some six (6) miles from the northwest city line of Philadelphia. The turnpike is an arterial state route and a part of the William Penn Highway.

2. The Seven Stars Hotel property is a three (3) story stone building with a porch along the front, a frame bar-room on the northeast end, a frame kitchen on the southwest side and a dining-room, parlor and hallway all on the first (1st) floor; bedrooms and storerooms on the second (2nd) and third (3rd) floors; and a cellar beneath the whole. For many years the tavern has been used as a saloon and employed for general hotel purposes.

3. Daniel Rastelli, the second defendant, occupies the hotel property as a tenant under a lease for one (1) year from the first defendant. The lease is dated the 1st day of last November. The rental is in the sum of one hundred and twenty-five ($125.00) dollars per month.

4. From not later than the 10th day of last October, the first defendant has occupied a house on property either adjoining or in the immediate neighborhood of the Seven Stars Hotel.

5. *(A).* During the morning of the 7th day of February, 1925, the hotel was raided by three (3) state policemen. Within the building the members of the raiding party found two (2) bottles of beer, one (1) beer bottle partly filled with whiskey, one (1) gallon glass jug filled with whiskey, two (2) gallon jugs, each about half full of wine, one-half ($\frac{1}{2}$) gallon bottle full of alcohol and two (2) whiskey glasses. All of the property so found was confiscated and delivered into the custody of Frank X. Renninger, Esq., district attorney of this county.

*(B)*. The intoxicating liquors and containers set forth in the last preceeding paragraph were discovered by the officers in the cellar of the hotel premises. The two (2) whiskey glasses were located in the bar-room beneath the bar.

*(C)*. At the time of the raid, the first defendant and his son, Charles Di Pasquale, were in the bar-room. Both were promptly placed under arrest by the officer in charge of the investigation.

6. *(A)*. In the evening of the 10th day of last October, John B. Stevenson, detective of this county, raided the Seven Stars Hotel. In the cellar he discovered a half (½) barrel of beer on tap and in the bar-room he found a quart bottle half-full of whiskey and, behind the bar, four (4) or five (5) glasses. These liquors and containers were confiscated and delivered, likewise, into the custody of Mr. Renninger.

*(B)*. Later in the same evening, the county detective searched the nearby home of Charles Di Pasquale. There the detective found seven (7) barrels of wine, claimed by Charles to be his property. Only a little while before, however, the wine had been removed from the hotel property.

*(C)*. Chemical analysis of the seized whiskey showed an alcoholic content of twenty-nine (29%) per centum per volume. The wine contained fourteen (14%) per centum of alcohol by volume.

7. *(A)*. During the evening of November 23, 1927, the county detective raided again the Seven Stars Hotel. On his second official visit, he found two (2) quart bottles half-full of whiskey and a half (½) barrel of beer on tap in the cellar.

*(B)*. Chemical analysis demonstrated each bottle of whiskey contained forty-eight (48%) per centum of alcohol by volume. Examination of a sample of the beer drawn from tap revealed a like alcoholic content of three and one-half (3½%) per centum.

8. The Seven Stars Hotel is a resort to which the general public may repair at will.

9. For a period of from three (3) years to a few months before the filing of the bill, intoxicating liquors were sold, furnished and possessed for beverage purposes in the Seven Stars Hotel.

10. Throughout the period mentioned in the immediately preceding finding of fact, the first defendant had actual notice that intoxicating liquors were being so sold, furnished and possessed.

11. The material allegations of the petition are true.

From the foregoing findings of fact there are drawn the following

## Conclusions of law.

1. The Seven Stars Hotel was and is a building in which intoxicating liquors were and are sold, furnished and possessed for beverage purposes in violation of the Act of March 27, 1923, P. L. 34.

2. The property described in the third (3rd) paragraph of the bill was and is a common nuisance within the meaning of section six (6) of the Act of March 27, *supra*.

3. Under section seven (7) of the said act, the court has jurisdiction.

4. The plaintiff is entitled to a permanent injunction enjoining and restraining the defendants and all other persons from manufacturing, selling, offering for sale, bartering, furnishing or possessing or otherwise dispensing any intoxicating liquor for beverage purpose in or upon the premises or any part of the premises delineated in the third (3rd) paragraph of the bill.

5. No defendant has any property right in any article kept on the premises in the manufacturing, selling, bartering, furnishing or possessing of intoxicating liquor and all such articles used in the maintenance of the common nuisance aforesaid, to wit, bar-room fixtures, beverage equipment and other paraphernalia employed in connection with violation of the prohibition enforcement law are contraband and forfeit to the plaintiff and are ordered to be removed forthwith from the hostelry.

6. For one (1) year from this date the Seven Stars Hotel shall not be occupied by the defendants or any other persons or person whomsoever for any purpose whatsoever and the sheriff of this county is directed to enter upon the premises of the hotel and close and put under lock and key and seal the property to the exclusion of both defendants and of every other person whomsoever and to place on the outside front of the road-house a conspicuous sign reading: "Closed And Padlocked. By Order of the Court of Common Pleas of Montgomery County."

7. The defendants and each of them shall pay the costs of this proceeding.

8. No intoxicating liquor shall be manufactured, sold, offered for sale, bartered, furnished, or possessed in the Seven Stars Hotel, or in any part thereof.

The foregoing findings of fact and conclusions of law are discussed in the form of the following

*Opinion.*

This is a proceeding in equity for a padlocking order against a liquor nuisance brought under sections six (6) and seven (7) of the Prohibition Enforcement Act of March 27, 1923, P. L. 34.

The former section of the statute says that "Any room, house, building, . . . . or place where intoxicating liquor is manufactured, sold, offered for sale, bartered, furnished, or possessed, in violation of this act . . . is hereby declared to be a common nuisance; and any person who maintains such a common nuisance shall be guilty of a misdemeanor and, upon conviction thereof, shall be subject to the penalties hereinafter provided."

The seventh (7th) section provides that "An action to enjoin any nuisance defined in this act may be brought in the name of the Commonwealth of Pennsylvania by the attorney-general . . . or by the district attorney of the . . . county, . . . Such action shall be brought and tried as an action in equity, and may be brought in any court having jurisdiction to hear and determine equity cases within the county in which the offense occurs. If it is made to appear by affidavit, or otherwise, to the satisfaction of the court that such nuisance exists, a temporary writ of injunction shall forthwith issue restraining the defendant from conducting or permitting the continuance of such nuisance until the conclusion of the proceedings. If a temporary injunction is prayed for, the court may issue an order restraining the defendant, and all other persons, from removing or in any way interfering with the intoxicating liquor or other things used in connection with the violation of this act constituting such nuisance. It shall not be necessary for the court to find the property involved was being unlawfully used as aforesaid at the time of the hearing but, on finding that the material allegations of the petition are true, the court shall order that no intoxicating liquor shall be manufactured, sold, offered for sale, bartered, furnished or possessed in such room, house, building, . . . , or place, or any part thereof. Upon the decree of the court ordering such nuisance to be abated, the court may, . . . , order that the room, house, building, . . . , or place shall not be occupied or used for one year thereafter; . . ."

In Com. *v.* Dietz, 285 Pa. 511 (1926), the Act of March 27, 1923, *supra,* was held a constitutional exercise of the police power for the protection of public health against "the illicit stream of deleterious, if not poisonous, liquors, which, in spite of earnest efforts at prohibition enforcement, flow through our State, . . ."

Pursuant to the above sections of the Prohibition Enforcement Act, a bill praying an injunction and abatement of a nuisance located on certain described premises in the Township of Plymouth, this county, alleged to belong to Enrico Pasquale and to be under the control of Daniel Rastelli, was brought by the district attorney in the name and on behalf of the Commonwealth. Proper allegations with respect to the description of the property and the thereon existence of a nuisance and its maintenance by Pasquale and Rastelli were contained in the bill. Among the specific charges were the following:

"4. That the premises aforesaid constitute a room or rooms, house, building, out-house, garage, structure and place, where liquor or beverages of an illegal alcoholic content are manufactured, sold, offered for sale, bartered, furnished and possessed in violation of law, thereby constituting said premises and illegal liquor and beverages and property kept or used in maintaining the same a common nuisance.

"5. That the said common nuisance has been conducted since Feb. 7, 1925, and is being conducted and permitted by the said defendant.

"6. That, on the 23rd day of November, 1927, liquor and beverages of an illegal alcoholic content were manufactured, sold, offered for sale, bartered, furnished and possessed in violation of law upon the aforesaid premises by the said defendants."

In response to the bill, Di Pasquale appeared and, by affirmed answer, admitted his ownership of the premises portrayed in the complaint but denied his occupancy or control of the property; averred lack of knowledge of violation of law in the hotel and, upon information and belief, denied such lawbreaking; denied, also, he had permitted knowingly a common nuisance to be conducted upon the premises since Feb. 7, 1925, and, upon information and belief, denied, too, the conduct of such nuisance; upon information and belief denied, likewise, that on the 23rd day of November, 1927, intoxicating liquor had been manufactured, sold, offered for sale, bartered, furnished or possessed in violation of law upon the premises of the tavern; and averred, finally, no present or future intention on the part of himself of permitting any one to conduct a common nuisance at the road-house. Notwithstanding these wholesale protestations of innocence by answer, at final hearing on the merits, with the Commonwealth pressing for a permanent injunction to abate a common nuisance, Di Pasquale refrained, for reasons best known, no doubt, to himself but perfectly transparent to a chancellor of ordinary intelligence, from taking the witness-stand and from offering a scintilla of testimony in his own defense. And when called to the stand—as he was—by the Commonwealth for cross-examination, he proved a singularly uninformative witness. Surely, in a court of equity, such silence is golden with suggestiveness.

Rastelli appeared, also, to the challenge of the county prosecuting officer and, by affirmed answer, denied all allegations of the bill touching the existence and maintenance of the nuisance charged. Furthermore, he averred that, as tenant in possession under a written lease dated the 1st day of last November, he had used the premises only as a general hostelry wherein rooms were furnished and meals were served to the general public. When the Commonwealth closed at final hearing, like Di Pasquale, Rastelli

stood mute, content to rest his weary cause in silence. As with the landlord, so the lessee did not see fit to walk into the witness-box, or to offer a word of testimony out of the mouth of another, or in any other manner to refute or explain one jot or tittle of the damning evidence of the plaintiff, in fact, neither defendant availed himself of the customary shield of the crook, a reputation among evil companions as a law abiding individual. Of course, the defendant may have mistaken, through force of habit or otherwise, the tribunal of their appearance. Although represented by counsel, still Di Pasquale and Rastelli may not have been able to adjust themselves to the environment of a civil proceeding. If so, their declination to testify and their failure to produce a single witness in defense were most unfortunate, for there was bound to ensue a situation pregnant with adverse inference. The utterance of the truth might have established a defense—if one there were. The defendants could have unsealed their lips but they did not. This fact cannot be disregarded in wholesome deliberation: 1 Wigmore on Evidence (2nd Ed.), §§ 286 and 289; and Brown v. Schock, 77 Pa. 471, 478 (1875).

As this is the first padlock case in the jurisdiction and as the questions here sought to be raised are likely to be recurrent in interposition if not now settled with finality, it may be worth while, especially in view of the absence of Pennsylvania appellate adjudication,—barring, of course, Com. v. Dietz, supra,—to express at some length and, as illuminated by well considered decision elsewhere, the views of this court as to the scope and meaning of sections six (6) and seven (7) of the Prohibition Enforcement Act, supra. To be sure, the books contain lower court decisions relative to the foregoing provisions of the act but, inasmuch as so many of the reported cases are so ill considered in thought as to arouse suspicion that, possibly, the writers may be so personally opposed to prohibition as to be officially prejudiced against enforcement, for the reasons hereinafter in part given it would seem better, rather than to bound vision by feeling, to look for guidance far out into the domain of national authority.

In the Prohibition Enforcement Act, supra, the General Assembly has adopted, in many respects, the language of Federal law. In truth, section two (2) of the statute has gone so far as to provide that in Pennsylvania intoxicating liquor shall mean anything found to be intoxicating by act of Congress passed pursuant to and in the enforcement of the Constitution of the United States. Section one (1) of the prohibiting law declares that the entire act is an exercise of the power granted by the Eighteenth (18th) Amendment to the Constitution of the United States and of the police power of the Commonwealth for the protection of the public welfare, health, peace, safety and morals of the people of the State and that all of the provisions of the act shall be liberally construed for the accomplishment of these purposes. Even a superficial examination of the statute reveals that our legislators have enacted a law following closely national legislation passed to enforce the Eighteenth (18th) Amendment,—so closely, in fact, that, in many essential features, sections six (6) and seven (7) of the State law are mere verbatim copies of the twenty-first (21st) and twenty-second (22nd) sections of the National Prohibition Law (41 Stat. 314). A comparison of State and Federal enforcement acts makes clear the policy of our legislature, namely, to align the enforcement efforts of the State with those of the Federal Government for the avowed purpose of presenting a united front against the strong, ramifying and notorious traffic in illicit liquors.

Since, then, the legislature has evinced an open and a palpable desire to co-operate with the Federal Government in the matter of prohibition enforce-

ment, it would seem to behoove a Pennsylvania chancellor, if honestly disposed to enforce law, to carry the co-operative policy manifested by the legislative branch of the state government into the sphere of legal construction and judicial interpretation and, in the absence of binding appellate authority within the Commonwealth, to follow the weight of Federal decision relative to statutory enactments common to both state and nation. Such course ought to increase the effectiveness of both State and Federal enforcement agencies and should bring to pass in the end a situation marked by simplicity and certainty, two (2) qualities highly desirable if real prohibition enforcement is to be attained. On the other hand, for us to ignore and refuse to follow Federal authority might tend to set at naught the uniformity of enforcement legislation now existing between our country and our Commonwealth.

A nationalistic yearning for co-operation in Federal and State enforcement is discernible beneath the language of the second (2nd) section of the Eighteenth (18th) Amendment saying that "The Congress and the several states shall have concurrent power to enforce this article by appropriate legislation." The twenty-second (22nd) section of the National Prohibition Act, *supra*, passed by Congress in pursuance of the second (2nd) section of the Amendment, provides that "An action to enjoin any nuisance defined in this title may be brought in the name of the United States by the Attorney-General of the United States, or by any United States Attorney, or any prosecuting attorney of any state, or any subdivision thereof . . . Such action shall be brought and tried as an action in equity and may be brought in any court having jursidiction to hear and determine equity cases."

At least two (2) state courts have held that from the words employed in the above section it was the evident intention of Congress to make available the judicial machinery of the states for the institution of actions in equity for the abatement of nuisances defined by the Federal statute: United States *v.* Stevens, 130 A. 249 (1925), (Conn.) ; and Carse *v.* Marsh, 189 Cal. 743, and 210 Pac. Repr. 257 (1922). If these cases be sound law, all the more desirable is it to have uniformity in state and Federal decision, else the state courts may get themselves into the untenable, unenviable, unexplainable and most embarrassing position of holding a contrariety of views on identical legislation. To avoid the very danger of confusion caused by a state act differing from a Federal statute on prohibition enforcement, certain forward looking commonwealths in the west have adopted as the law of their states not only the present provisions but all future amendments of the National Prohibition Act, *supra;* See California Statutes of 1921, page 79; Nevada Laws of 1923, page 37; and New Mexico Laws of 1928, page 118. The Montana statute provides a penalty for any person violating the state law of the National Prohibition Act: See Montana Statutes of 1921, page 267; and Blakemore on Prohibition (3rd ed.), § 22, page 27. Mindful as we are that no obligation rests upon us to be bound by Federal decision, it would seem, nevertheless, that the ends of law will be served better if we follow in the wake of national authority instead of considering sections six (6) and seven (7), *supra*, as unamplified by state appellate decision and with no guide except the human reason of but a single mind: People *v.* Wicka, 192 N. Y. Supp. 633, 636 (1921), and cases there cited. Since prohibition is a national as well as a state policy, it is proper for a chancellor, so far as lies within his power, to make every effort to avoid the confusion and conflict which are "an inseparable incident of independent legislative action in distinct jurisdictions."

As stated heretofore, the bill was filed Dec. 10, 1927, and forthwith a rule, returnable Dec. 16th, was granted on the defendants to show cause why a preliminary injunction should not be issued as prayed. After two (2) continuances a hearing on the merits was held Jan. 27, 1928. Counsel agreed the hearing should be final, answers having been filed by Di Pasquale and Rastelli on Jan. 16, 1928, and Dec. 28, 1927, respectively.

From the evidence introduced at hearing by the Commonwealth the conclusion is inescapable that open and flagrant violations of the law have been committed upon the premises portrayed in the bill at least until the very moment a stock of liquor was taken into legal custody. Let us review, briefly, that testimony.

On the morning of Feb. 7, 1925, three (3) members of the state police raided the premises parading the heavenly appellation of Seven Stars Hotel and standing then, as now, in the name of the defendant Di Pasquale. The hotel is located on the Ridge Turnpike Road,—an arterial thoroughfare forming part of the William Penn Highway—in Plymouth Township, this county, about two (2) miles from the Borough of Norristown and six (6) miles from the City of Philadelphia. The tavern is one of those old country hostelries so common in the pre-automobile age and which are still to be seen occasionally about the landscape in varying degrees of decadence—victims of an ever-changing world. At one time centers of social life of township or village, the oases for thirsty horses and their still thirstier drivers and havens for belated travelers, these hostelries stand now shells of their former selves, stripped of all usefulness by the advent of the motor-vehicle and the progress of the law of the land. Into such an establishment on the morning of Feb. 7, 1925, did the officers of the Commonwealth enter and there did they find two (2) bottles of beer, one (1) beer bottle partly filled with whiskey, one (1) gallon glass jug half full of whiskey, two (2) gallon jugs each about half filled with wine, one-half (½) gallon bottle about half full of wine and two (2) whiskey glasses, the glasses were beneath the bar. The liquors were below the bar-room floor, in the cellar. At the time of the raid, the defendant Di Pasquale and his son Charles were on the premises and were put under arrest by the state officers.

Two and one-half (2½) years elapsed and again the hotel attracted the attention of a law enforcing agency. On Oct. 10, 1927, the county detective visited the ill, if seven starred road house. The second raid netted a half (½) barrel of beer on tap in the cellar, one (1) quart bottle half filled with whiskey and four or five glasses behind the bar. Upon analysis the whiskey was found to contain twenty-nine (29%) per centum of alcohol by volume. On this same occasion, the county detective searched, also, a house adjoining the hotel premises where lived Charles Di Pasquale. Here, the detectives found seven (7) barrels of wine admitted by Charles to be his property. Shortly before, the wine had been removed from the hotel to the home of the son of the first defendant. A sample of the wine showed an alcoholic strength of fourteen (14%) per centum by volume.

On Nov. 1, 1927, the defendant Rastelli enters the scene as the luckless lessee of the antiquated saloon at the monthly rental of one hundred and twenty-five ($125.00) dollars. Whence came the revenue wherewith to pay such high rental for a place of business hit so hard by prohibition and the twentieth century. Rastelli, presumably a business man of the same type as his predecessors, when left to his own devices and the admonitions, or want of them, of his own conscience, soon applied the hotel to ancient use and purposes. But his road to ill-gotten wealth was steep and thorny for, on Nov. 23rd, once more the road-house was raided by the county detective, who

found two (2) quart bottles half filled with whiskey and one-half (½) barrel of beer on tap in the cellar. Both bottles of whiskey contained forty-eight (48%) per centum of alcohol by volume and beer drawn from the tap showed three and one-half (3½%) per centum of alcohol by volume. As on previous raids, the liquors were confiscated according to law.

In the half decade just passed, no branch of the law has grown faster than that having to do with intoxicating liquors. Hence, to unearth, assemble and segregate—entirely by our own research and without the slightest aid whatsoever from the elected district attorney, or any one of his three (3) salaried assistants, or from the presumptively feed counsel for either defendant—the mass of cases of which only a relatively few are hereinafter reviewed has been no easy task.

As hitherto observed, the bill alleges, *inter alia*, that the Seven Stars Hotel is a building in which intoxicating liquor is manufactured, sold, offered for sale, bartered, furnished and possessed in violation of law. Quite obviously, this allegation was made for the purpose of pleading the facts constituting the nuisance in question, for section six (6) of the Prohibition Enforcement Act, *supra*, defines a common nuisance under the statute by the same language in the disjunctive form. Consequently, it is apparent that a common nuisance under the act may result from manufacturing, selling, offering for sale, bartering, furnishing or possessing intoxicating liquor, except as permitted by the act, and that the bill must aver as a fact at least one (1) of the things prohibited. The allegations in the bill are not in the disjunctive and, therefore, are in proper form. The bill charges specifically the illegal possession of intoxicating liquor, an allegation supported by evidence of the Commonwealth and uncontroverted by either defendant. Since the fact of possession alone, when in violation of law, falls within the purview of the statutes, the pertinent question is, Does the undisputed possession proven by the Commonwealth constitute a nuisance. This question must be answered in the affirmative.

The word "possessed," read in connection with the words immediately associated, means possessed for sale or barter or other commercial purpose. See Street *v.* Lincoln Safe Deposit Co. et al., 254 U. S. 88 (1920), Clarke, J., in which the word "kept" used in a similar sense in the National Prohibition Act received a like construction. There is no escape from the conclusion that intoxicating liquor was possessed on the premises of the Seven Stars Hotel on Feb. 7, 1925, and Oct. 10 and Nov. 23, 1927, for commercial purposes and in violation of law.

An actual sale need not be shown. Common knowledge supports not merely an inference, but the rather firm belief, respecting some kind of bartering, selling or furnishing at or near a place where a half-barrel of beer is kept on tap. Indeed, the unexplained possession of intoxicating liquor on premises equipped with a bar-room and accessories can lead to no other conclusion than the one reached.

At argument, counsel for the first defendant, after admitting virtually the truthfulness of the evidence of the Commonwealth, contended, with seeming earnestness, that the three (3) instances of unlawful possession would not warrant, under the circumstances, a finding of the existence of a common nuisance. The legislature has created a mould for a liquor nuisance and the facts of the case at hand fit the mould. The state law-making body has declared that any building where intoxicating liquor is possessed (for commercial purposes) is a common nuisance. In Mugler *v.* Kansas, 123 U. S. 623 (1887), a Kansas statute—a pioneer in prohibition legislation and almost

identical in language with the provisions of our act so far as related to injunction proceedings and nuisance abatements—was unsuccessfully attacked as unconstitutional. On pages 673 and 674, the Supreme Court, by Mr. Justice Harlan, said: "Here the fact to be ascertained was, not whether a place, kept and maintained for purposes forbidden by the statute, was, *per se*, a nuisance—that fact being conclusively determined by the statute—but whether the place in question was so kept and maintained."

It is not within the province of the court to pass upon either the wisdom or expediency of legislation. If the owners and proprietors of cheap cafés, way-side inns, road-houses, and other hooch nondescripts have become the objects of special and vigorous legislation, only such owners and proprietors, themselves, are to blame. Usually, these dispensaries are festering spots of immorality, drawing in their train an ugly brood of evils. Surely, the legislature may label such dens of iniquity nuisances, *per se*, despite the fact that at common law they may not have been necessarily so treated: United States *v.* Reisenweber (C. C. A.), 288 Fed. 520, 524 (1923). In our generation, the policy of a broad construction of the police powers is in the ascendancy. In the absence of palpable unreasonableness, much is left to the discretion of legislative bodies as to what is most conducive to ·public welfare.

The contention of counsel for Di Pasquale to the effect that the Commonwealth must show repeated, or, as sometimes stated, "habitual, recurrent and continuous," violations of the prohibition law is unsupported by the language of section six (6), *supra*. The statute says baldly that any building where intoxicating liquor is possessed in violation of the act is a nuisance. The statute does not provide that any prescribed length of time of the unlawful possession of intoxicating liquor shall be necessary in order to constitute the place of possession a nuisance. The act does not furnish the number of times intoxicating liquor must be possessed in order to·constitue the structure housing criminal law infraction a nuisance. The fact of unlawful possession within the interdiction of the statute constitutes the offending nuisance and, manifestly, offense may be given in one (1) day just as well as in two (2) or more days: Feigin *v.* United States (C. C. A.), 279 Fed. 107, 108 (1922). While the case last cited arose on the criminal side of the court, it has been held, repeatedly, that facts which constitute a basis for a criminal action for keeping a common nuisance constitute a basis also for equitable relief.

"The definition of a common nuisance for which one may be prosecuted criminally, and a common nuisance which may be made the basis of an action in equity by injunction, is precisely the same. If the language·of the act is to be given its ordinary meaning, that which constitutes a common nuisance for the purpose of a criminal prosecution will also constitute a common nuisance to support any action in equity. The language of the act suggests no reason why the public authorities may not resort to either or both remedies:" United States *v.* Eilert Brewing and Beverage Co. (D. C.), 278 Fed. 659, 662 (1921). To return to the argument of counsel for the first defendant that the Commonwealth should have shown habitual, recurrent and continuous violations of the law on the premises of the Seven Stars Hotel, it is repeated that no obligation rested upon the plaintiff to establish such infractions.

The statutory definition of a common nuisance under consideration does not specifically include or exclude the idea of continuous or recurrent violations but, in the light of the common law definition of a common nuisance, the considered legislation connotes an element of continuity and in the cases shortly to be discussed the notion of recurrence and duration colored, albeit subconsciously, the mental processes of the presiding jurists.

Before further consideration of this point, however, it may be well to look into the purpose of section seven (7) of the Prohibition Enforcement Act, *supra;* for legislative intention, when discernible, is always of paramount importance in any inquiry concerning the scope and application of a statute. If the legislature intended that equitable aid should be invoked only after long-continued violation, or a recurrence of unlawful acts indicating that the criminal prosecutions and penalties provided by other parts of the statute are inadequate to cope with the situation, then it would seem that the Commonwealth must show the impotence of the criminal courts and other agencies constituted for the punishment and suppression of criminal conduct by habitual, recurrent and continuous occurrence of the inhibited wrongs. In view of the language of section seven (7) and decided cases, it appears clear that the district attorney need not inferentially plead helplessness when he files his bill of complaint on behalf of the Commonwealth: United States *v.* Eilert Brewing and Beverage Co., *supra,* page 662, holding a bill in equity may be resorted to for a first violation; Lewinsohn *v.* United States (C. C. A.), 278 Fed. 421, 423 (1921), in which it was held that the scheme of sections twenty-one (21), twenty-two (22) and twenty-four (24) of the National Prohibition Act was to supply a more prompt, effective and efficient means of abating nuisances than the institution of criminal proceedings; United States *v.* Boynton (D. C.), 297 Fed. 261, 267 (1924), where the court stated that the injunction was not intended as a punishment or penalty for previous fault but merely as a helpful and reasonable aid in abating the nuisance: Denapolis et al. *v.* United States (C. C. A.), 3 Fed. (2nd) 722, 723 (1925).

The statute having declared the premises where intoxicating liquor is kept to be a common nuisance, the Government has the right to abate that nuisance by a suit in equity, nothwithstanding it at the same time has a further right to resort to criminal prosecutions. It may resort to either method or both, at its discretion: In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092; Mugler *v.* Kansas, 123 U. S. 623, 673. . . . The former proceeding is against property used for forbidden purposes, while the latter is for the punishment of the offender: Mugler *v.* Kansas, *supra,* page 671. A judgment in the criminal case will not make the issues *res judicata* in this proceeding: Stone *v.* United States, 167 U. S. 178 (1897), Harlan, J.; Chantangco *v.* Abaroa, 218 U. S. 476 (1910), Lunton, J.; and Murphy et al. *v.* United States, 272 U. S. 630, 632 (1926), Holmes, J.

Now let us consider what facts fit the legislative mould of a common nuisance. As stated above, counsel for Di Pasquale stressed the necessity of showing repeated violations by possession in order to justify a finding of a common nuisance. By way of authority, counsel might have cited United States *v.* Cohen (D. C.), 268 Fed. 420, 423 (1920; United States *v.* Butler et al. (D. C.), 278 Fed. 677, 679 (1922); and United States *v.* Schwartz et al. (D. C.), 1 Fed. (2nd) 718, 722 (1924). However, these cases do not represent the weight of Federal authority and do not furnish either an accurate or exclusive test. The court might well conclude from evidence of a single sale or act of possession that a building was a common nuisance and that it was a place where liquor was sold and possessed in violation of the statute. What could be more persuasive evidence to support a finding that premises fall within the definition of a common nuisance contained in section six (6) of the act than the presence of a half empty beer barrel on tap in an old hotel? Why is the beer on tap? What happened to the other half of the contents of the barrel? The conclusion is irrefutable. Before the raid, the bar-

room had been used in the recent past to sell, barter or furnish intoxicating liquor in violation of law and at the time of the raid was equipped and supplied for future business. Certainly, such a fact of possession in such a setting meets the connotation of duration contained in the word nuisance. The true rule is that a single unlawful sale, or a single instance of unlawful possession, together with other evidence from which it may be reasonably deduced that the act proven is merely one in a chain of unlawful acts of indefinite duration committed upon the premises is sufficient. Under section twenty-two (22) of the National Prohibition Act, in the following cases injunctions were granted upon proof of a single sale: Lewinsohn v. United States, *supra*, page 424; United States v. Reisenweber et al., *supra*, page 525; United States v. Eilert Brewing and Beverage Co., *supra*, page 662; United States v. Stevens, *supra*, page 252; and United States v. Marhold et al. (D. C.), 18 Fed. (2nd) 779, 780 (1927). See, also, Singer v. United States, 288 Fed. 695, 696 (1923), Woolley, J. The same rule was upheld in criminal prosecutions for maintaining a common nuisance in Wiggins v. United States (C. C. A), 272 Fed. 41 (1921); Young v. United States (C. C. A.), 272 Fed. 967 (1921); Strada v. United States (C. C. A), 281 Fed. 143, 144 (1922); Fassolla v. United States (C. C. A.), 285 Fed. 378 (1922); Singer v. United States, *supra*, page 696; Marshallo v. United States (C. C. A.), 298 Fed. 74, 76 (1924); and Feigin v. United States, *supra*. By a parity of reasoning, one act of unlawful possession under some circumstances is sufficient to support an allegation of the statutory nuisance. The enforcement act prohibits possession for commercial purposes in the same language and with the same emphasis as it forbids the sale of intoxicating liquors.

The mere fact that only a small quantity of liquor was found on the premises in question on the occasion of each raid in no way minimizes the force of the foregoing conclusions. The trier in equity need not draw the curtain on his knowledge of the illicit liquor traffic gained by experience as a judge in the Quarter Sessions. It is notorious that a small hotel does not keep much stock on hand for reasons too obvious to require enumeration. Especially is this true where the owner or proprietor of the hotel premises owns or controls nearby premises, as in the instant case; and, hence, in passing, we note the testimony relative to the seven (7) barrels of fourteen (14%) per centum wine found, on Oct. 10, 1927, in the not far away home of Charles Pasquale, then proprietor of the Seven Stars Hotel.

Counsel urge strenuously the necessity of finding the existence of the nuisance when the bill was filed and the probability that the nuisance will continue in the future. The most recent violation of the enforcement act was shown to have occurred on Nov. 23, 1927, and the bill of complaint, filed Dec. 10, 1927, alleges a present violation. Therefore, a hiatus of seventeen (17) days exists between the last shown violation and the institution of proceedings to abate the alleged nuisance. The record fails to show any change in the business conducted as of Feb. 7, 1925, and Oct. 10th, Nov. 23rd and Dec. 10th of last year. The conditions which existed on Feb. 7, 1925, and Oct. 10th and Nov. 23, 1927, existed on Dec. 10, 1927, and exist to-day. Although in court, the defendants made no attempt to show a change of conditions. Moreover, our findings are strengthened by the well-recognized presumption that a condition of a continuous nature once shown to exist will be presumed to continue. This presumption applies to nuisances: Com. v. Finnerty, 148 Mass. 162, 166 (1889), Knowlton, J.; Shore et al. v. United States (C. C. A.), 282 Fed. 857, 860 (1922); Marshallo v. United States, *supra*, page 76; and Kennedy v. United States (C. C. A.), 4 Fed. (2nd) 486, 487 (1925). See,

also, United States *v.* General Amusement Co., Arizona et al. (D. C.), 19 Fed. (2nd) 630, 632; 22 C. J. Evidence III Presumptions, *B.* Of Fact, 3. Continuance of Fact on Condition, *a.* General Rule, § 28, page 86, and *b.* Application of Rule, § 29, page 87; 2 Wharton's Criminal Evidence (10th ed.), § 816, pages 1573-7; 1 Wigmore on Evidence (2nd ed.), § 382, pages 705-7; and 16 Cyc., 1053. See, too, Fuller's Estate, 250 Pa. 78 (1915), and Oller *v.* Bonebrake, 65 Pa. 338, 344 (1870), Sharswood, J.

In Com. *v.* Finnerty, *supra,* the Supreme Judicial Court of Massachusetts said, page 166: "But the illegal keeping of intoxicating liquor with intent to sell it, like keeping a nuisance, is a continuing offense, which may extend over a long or short period of time: Com. *v.* Purdy, 146 Mass. 138. If attention is directed to any point of time during the keeping, there is a probability, from the very fact of keeping them, that the same condition has existed from some previous time, and will continue for some time into the future."

In Shore et al. *v.* United States, *supra,* it appeared that the premises had been maintained as a nuisance on Aug. 24th and Nov. 19th. The bill of complaint, filed Nov. 24th, charged the maintenance of a nuisance on that date. The evidence failed to show any change in the business between Nov. 19th and 24th. Nevertheless, the court found that the condition existing on Aug. 24th and Nov. 19th continued until Nov. 24th.

In Marshallo *v.* United States, *supra,* error was assigned to the charge of the District Court, which had instructed the jury that a single sale of alcoholic liquor is sufficient evidence to establish a nuisance for the reason the law presumed the same condition continued until the evidence shows to the contrary. In this respect, on appeal, the charge was upheld.

The case of Kennedy *v.* United States, cited above, illustrates well how heavily courts will lean upon the presumption of continuance. In that case, the proof of the Government was confined to numerous violations of the law between the 1st and 12th days of May. The bill of complaint was not filed until Sept. 29th. At the hearing, there was no testimony of any specific violation of law on the premises during the hiatus of four (4) or five (5) months. Likewise, there was no evidence showing that intoxicating liquor had not been sold or kept between May 12th and Sept. 29th. In affirming the decree of the District Court, which had padlocked the premises, the Circuit Court said, page 488: "The flagrant violations of the National Prohibition Act between May 1st and May 12th, the general atmosphere of the place, its location, fittings, furnishings, patrons and attendants, and the business conducted therein, satisfied the court below that the presumption continued up to the time of the commencement of the suit, and it cannot be said, as a matter of law, that the court erred in that regard."

Wigmore on Evidence, *supra,* clearly sets forth the reason underlying this rule of evidence and the application of the rule: "The prior or the subsequent existence of such a fact is always evidential to show its existence at a time in issue, upon the general experience that such facts involve a human attitude more or less continuous and permanent. The probability of continuance depends much, of course, on the nature of the specific fact and the circumstances of each case; and, therefore, in setting a limit of time for the range of evidence, the discretion of the trial court should control. . . . Such evidence is receivable to show the *mode of conducting a business,* the *keeping of liquors illegally.* . . ."

The fact that the officers of the law who raided the Seven Stars Hotel confiscated the liquor there found under a positive duty impressed upon them by section eight (8) of the Prohibition Enforcement Act, *supra,* did not work

such an abatement of the nuisance as rendered this court powerless. At hearing, the defendants offered no evidence to show a voluntary abatement. Such abatement, if any, as resulted from the seizure of the liquor by the officers cannot redound to the benefit of the wrongdoers: United States v. Margolis et al. (D. C.), 289 Fed. 161 (1923). If the nuisance ceased on Nov. 23, 1927, or thereafter, cessation was due to the activity of the police and not to a desire upon the part of the defendants to put the Seven Stars Hotel to legitimate uses. See State v. Humphrey, 94 Wash. 599; 162 Pac. 983 (1917), in which the Supreme Court of Washington had under consideration a case arising under the "red light" abatement statute of that state.

In the case of Shore v. United States, supra, it is written: "If the transgressions have ceased before the bill is filed and before proceedings are instituted, and if it appears that they will not be repeated, injunctive relief will not be granted."

No such appearances as are referred to in the last quotation exist in the present controversy. Here, the transgressions did not cease before the bill was filed. Furthermore, cogent reasons are entertained for holding that future transgressions will be committed at the Seven Stars Hotel unless the Commonwealth resorts successfully to all the remedies afforded by law to make the cessation, if any there has been thus far, perpetual; of course, if a nuisance has ceased to exist, in the sense that there is no reasonable likelihood of recurrence, necessarily a dismissal of the suit would follow: United States v. Chesebrough Manuf. Co. (D. C.), 11 Fed. (2nd) 537, 538 (1926).

In considering the reasonable likelihood of a recurrence of the inhibited use of the premises in question, great weight has been given to the character of the hotel and of the violations which have already occurred there. The chancellor is dealing with an old inn which enjoys the seclusion of the country and easy accessibility by a fine highway from centers of population. The tavern is too old fashioned to compete in a general hostelry business with the modern hotels of nearby Norristown and Philadelphia and lacks totally the air of hospitality and respectability necessary to attract tourist trade. In other words, the Seven Stars Hotel, although devoid of the bright lights and kindred embellishments of more modern sisters, is a road-house hostile to public health, safety and morals in a township bordering the Borough of Norristown and in a county adjacent to the City of Philadelphia. Temptation for the acquisition of quick wealth, if not also economic necessity, indicates strongly that these defendants, or men of their ilk, if subjected only to the deterrent effect of the criminal law, will soon be plying the old trade at the old stand. In this connection, we quote at length the keen observations of Judge Tuttle in United States v. Boynton, supra, at page 267: "Obviously the permitted closing of a place which has been used for the maintenance of a nuisance, as part of the provided procedure for the abatement of such nuisance, was not intended as a punishment nor a penalty for previous fault, but merely as a helpful and reasonable aid in abating the nuisance. It is clear that such a remedy, accompanied and safeguarded as it is by the discretionary power in the court to apply and adopt it to the circumstances of each particular case, is both effective and just. It is a matter of common knowledge, of which this court will take judicial notice, that the existence of a nuisance of this kind involves, not only the presence of intoxicating liquor, but also the habitual presence of those who come to the premises to sell and to purchase such liquor, and who necessarily assist, and participate in, the continued maintenance of

such nuisance. The usual, if not inevitable, result is that the place acquires that 'probability that the old customers will resort to the old place,' which the law recognizes, in connection with a lawful business, as 'good-will.' The good-will of a reputable business is valued throughout the business world. Purchasers pay thousands of dollars for this element of a legitimate business, knowing that the habits of customers in patronizing a particular institution become so fixed as to greatly enhance its value. So, when a place becomes a public nuisance because intoxicating liquor is there purchased, kept and sold for beverage purposes, it establishes a reputation and acquires customers who will continue to frequent that location. This naturally and necessarily renders it unusually difficult to prevent future violations of the law in that place, with consequent continuation of the nuisance. It is not to be expected that an owner of premises who has already failed to prevent its use as a public nuisance will be more successful in that respect in the future, notwithstanding the entire innocence and good faith of such owner."

Knowledge of the owner that his premises are used for illegal purposes need not be shown in an action for the abatement as a nuisance of the property where intoxicating liquors are sold and such knowledge is not a condition precedent to an order closing the place for one year: United States v. Boynton, supra; United States v. Studio Club (D. C.), 12 Fed. (2nd) 462, 464 (1926); Farrell v. United States (C. C. A.), 21 Fed. (2nd) 318, 319 (1927), and the cases there cited. The decision in United States v. Schwartz, supra, is to the contrary, but we are relieved of a choice of Federal authority on this point, inasmuch as it appears clearly from the evidence that the defendant Di Pasquale knew well the Seven Stars Hotel was being used and occupied for unlawful purposes.

The question remains whether, under the seventh (7th) section of the act, the court is to "padlock," to use the popular expression, the entire premises or the rooms to which the violations of law have been confined—an inquiry left, apparently, to the discretion of the chancellor under the facts and circumstances of each case. If the purposes of law enforcement can be achieved by the padlocking of one room, it would follow from the non-punitive nature of the statute that the padlocking order should be so confined. In this case, however, the purpose of the padlocking order will not be effective unless the order be made applicable to the entire building. Any limitation or restriction on the extent of the order would vitiate the abatement of the nuisance. With this conclusion the above Federal authorities are in strict accord. See, likewise, Com. v. Guzzi et al., 27 Lacka. Jurist, 106, 110 (1926); and Com. v. Puras et al., 28 Lacka. Jurist, 29, 31-2 (1927).

And now, this 22nd day of June, 1928, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows: This adjudication shall be filed and become part of the record and, upon the filing of the adjudication, the prothonotary shall enter a decree nisi and give notice to the parties, or their counsel, of the entry of the decree. The prothonotary is directed to notify the parties, or their counsel, also, that if, within ten (10) days after such notice, no exception be filed, all objections will be deemed to have been waived and the decree nisi will be entered as a final decree by the prothonotary as of course.

From Aaron S. Swartz, Jr., Norristown, Pa.