## Schumacher, Admr., v. Swartz, Exec.

4

Before Oliver, P. J., Crumlish and Sloan, JJ. Crumlish, J., dissents.

*S. E. Ewing* and *A. Page*, for plaintiff.

*E. D. Barker, L. W. Harris, Jr.,* and *William A. Gray*, for defendant.

OLIVER, P. J., December 15, 1948.—This suit in trespass was brought by the administrator of the estate of William G. Schumacher, deceased, against the executor of the estate of A. Karl Fischer, deceased, under the wrongful death statutes and the Fiduciaries Act, for the benefit of Schumacher's widow and five minor children and for the benefit of his estate.

The cause of action arose out of the accidental crash of a small airplane, in which Fischer and Schumacher were flying at the Doylestown, Pa., airport at 8 p.m. on June 29, 1946. The jury found that Fischer was in *exclusive* control of the plane and that the accident had been caused solely by his negligence.

They returned a verdict for plaintiff in the sum of $65,729.30, awarding $55,000 thereof to Schumacher's widow and children and the balance, $10,-729.30, to his estate. The matter is now before us on defendant's motion for judgment n. o. v. and new trial.

The negligence in the operation of the plane which caused it to crash, killing both Fischer and Schumacher, was so gross and so obvious that it was virtually conceded. The real question the jury was called upon to decide under the evidence was, who was operating the plane at the time of the accident?

The case was unusual because Fischer and Schumacher were seated respectively in the front and the rear cockpits of a small plane having dual controls, and proof of who was operating the plane had to be established by circumstantial evidence. However, the circumstantial evidence in this case was so complete and convincing that it left no room for reasonable doubt.

Before outlining the evidence as to who was operating the plane, it is perhaps advisable to set forth the manner in which it was operated. It was a Kinner-Fleet biplane and had only 125 horsepower. After the two men got into the plane it was flown uneventfully

for half an hour, within sight of the airfield, and then returned to the field, which had a grass landing area. At an elevation of only 300 to 400 feet above the ground, it made a righthand turn into the east-west axis of the field, whereas the traffic pattern of the airport called for a lefthand turn. From that moment until the crash, the plane was put through three repetitions of a violent aerobatic maneuver or stunt. When a plane makes a normal landing, its engine is throttled down and the plane glides down at low speed onto the runway or field. The proper landing speed of the plane carrying Fischer and Schumacher was between 40 and 50 miles per hour. Instead of gliding down at that retarded speed, however, the plane dove down to within 25 feet of the field with the power on, at between 125 and 135 miles per hour. Then it was pulled up and made a sharp climbing turn to the left, reversing its direction 180 degrees. Then, from an elevation of 300 feet, it dove again at 125 miles per hour to within 25 feet of the ground at the edge of the airport. Again it was pulled up and made a sharp climbing turn to the left, again reversing its direction 180 degrees. Then, for the third time from an elevation of 300 feet, and at the same high speed, it dove down to within 25 feet of the ground. It was then pulled up in a vertical climb. At the top of the climb, the plane stalled out to the right, dropped its right wing, dropped its nose, rolled over half on its side and half on its back with the nose pointed vertically down, and dove from a height of 300 feet into the ground, killing both of the occupants. The plane was climbing too steeply, which caused it to stall and lose its flying speed, and there was not sufficient distance between it and the ground to permit the plane to regain flying speed and to be brought under control by the pilot.

According to the evidence, from the time the plane entered the field, at the end of its 30 minutes of un-

eventful flying, until it crashed, it was in danger. It was impossible to land that type of plane on the Doylestown field at the high speeds at which it was three times driven down to within 25 feet of the ground. When diving close to the ground at such speeds any miscalculation on the pilot's part endangers the plane and subjects it to a high degree of risk. Furthermore, when a plane is pulled up abruptly, it is likely to lose its flying speed, causing it to stall, get out of control and drop nose first to the ground. When that happens at the low elevation at which this plane was being flown, a crash is inevitable because a plane has to fall 500 feet or more before it can regain sufficient speed to enable the pilot to control it. Stunts, such as this plane was being put through, should be performed at an elevation of not less than 2000 feet, so that if it stalls there will be ample space in which the pilot may again bring it under control. Furthermore, it requires an engine of high power to pull a plane through a steep climbing maneuver such as was being attempted, and the plane in which the men were flying did not have such power, having only a 125 horsepower engine.

Therefore, it is apparent that this plane was being operated in an extremely negligent manner from the start to the finish of the three repetitions of the dangerous maneuver which resulted in the crash that killed both of its occupants.

The Act of April 25, 1929, P. L. 753, 2 PS §57, cited as "State Law for Aeronautics", defines a "passenger" as "Any person riding in an aircraft but having no part in its operation," (section 2), and provides in section 6 as to liability for torts:

"The owner and the operator, or either of them, of every aircraft which is operated over the lands or waters of this Commonwealth, shall be liable for injuries or damage to persons or property on or over

the land or water beneath, caused by the ascent, descent, or flight of aircraft, or the dropping or falling of any object therefrom in accordance with the rules of law applicable to torts on land in this Commonwealth."

In 6 Am. Jur. §28 it is stated that an aviator not carrying passengers for hire is required to use ordinary care such as "an ordinarily prudent or reasonably careful person, would use under the same or similar circumstances". That is in full accordance with the charge of the trial judge.

Charles S. Rhyne in his recently published Aviation Accident Law, states the rule as follows, at pages 58-59: "Under the authorities herein reviewed private pilots who do not carry passengers for hire . . . will be held to exercise that degree of care that an ordinary prudent man would use under the same or similar circumstances rather than the high degree of care imposed on common carriers. This means that private pilots will have their liabilities in accident cases based upon the degree or standard of care prescribed by the familiar common law principles of negligence."

So much for the question of negligence, as to which there was no real dispute. The following is briefly the substance of the circumstantial evidence on which plaintiff relied to prove that Fischer was in exclusive operation of the plane when this negligence occurred:

The stunting maneuver the plane was put through three times in succession was one which only a pilot having a high degree of skill and experience could perform.

Fischer was an experienced professional pilot. He was one of the instructors at the Doylestown Airport. He had an instructor's rating and a commercial license. On the other hand Schumacher was a novice, just starting to learn to fly. He had a student pilot's license, which was merely a permit to begin to learn,

similar to the permit one must have before taking instruction in the art of handling an automobile. He had had 11 hours of dual control flying, and had flown solo only 9 times for a total of 3 hours and 35 minutes, his last flight having been taken approximately four months prior to his death. His total flying experience as a student, spread thin over a period of twelve months, aggregated only 14½ hours, an average of just a trifle over 1 hour per month. He had a modest income and a family to support and flew only on the few occasions when he had the cash to spare. He had never flown a Kinner-Fleet biplane. He had never been taught aerobatics or stunt flying, and had never requested such instructions. In the Canadian Air Force pilots are required to have between 50 and 60 hours of elementary training in ordinary flying, as contrasted with Schumacher's 14 hours, before they are permitted to start to learn elementary aerobatics.

Fischer had the skill and experience required to put the plane through the maneuver, which was completed successfully twice and nearly completed successfully a third time, when the crash occurred. Schumacher definitely did not have either the skill or experience to perform the maneuver in the manner in which it was performed. He was a mere beginning student.

Fischer's flying style was abrupt and sharp and characterized by quick maneuvering. It could readily be distinguished from that of any other pilot at the field (just as the bold, dashing signature of John Hancock stands out on the Declaration of Independence). On the other hand, Schumacher's flying style was entirely different. It was exceptionally conservative, cautious, gentle and smooth. He was very easy on the controls.

The plane in which the men went up was Fischer's plane.

Fischer had bought the plane especially for learning and practicing aerobatics, in which he was keenly interested. Aerobatics consist of violent maneuvering of the controls so as to make the plane perform stunts.

When Fischer's plane started at the airport, Fischer sat in the front cockpit, the pilot's cockpit, from which he always flew his plane. Schumacher sat in the rear cockpit.

The plane could be started only from the front cockpit.

When the two men were seated it was Fischer who gave the necessary signals in order to get clearance for the plane to start.

As the plane began to taxi across the field, Schumacher's hands could be seen holding onto the sides of the plane, at the point where he was sitting in the rear cockpit.

Fischer had promised Schumacher to fly him in Fischer's plane, during the afternoon of the day on which the crash occurred, to an airmeet in Camden. Adverse wind conditions prevented his doing so. The two men therefore spent some time at the Doylestown Airport and had dinner at Doylestown at 6 p.m. After that they returned to the airport, where they found that the wind had slackened. Fischer then went over to the manager of the airport and said he wanted to take Schumacher for a ride in his (Fischer's) plane.

Fischer's agreement with the airport, where he was employed as an instructor, forbade him giving instructions or carrying passengers for hire in his own plane. For such purposes he was required to use the small, 65 horsepower Piper-Cub monoplanes belonging to the airport. An inference properly arises that Fischer was not violating his contract obligations, and particularly so when he was about to land his plane in the presence of the airport manager.

Although Fischer had an abrupt dashing style, he would frequently fly conservatively for a time and then indulge in sharp, quick and abrupt maneuvers.

The traffic pattern of the airport required planes to enter the field with a left turn. Fischer habitually entered with an abrupt right turn. Schumacher habitually followed the traffic pattern and entered it normally with a gentle conservative left turn.

Throughout the entire flight which ended in the crash, the plane was flown in Fischer's style. After a half hour of uneventful flying, it was brought into the traffic pattern abruptly with a sharp right turn. Then it was put through violent maneuvers sharply, abruptly and with dashing assurance.

A few hours before the accident occurred, Fischer had flown in the back seat of an airplane belonging to and operated by a friend or acquaintance of his named Badger. It was an Army surplus AT-6, an advanced trainer of the type used by the Army especially for aerobatics. It had 700 horsepower, as contrasted with the 125 horsepower of the Kinner-Fleet plane belonging to Fischer and the 65 horsepower of the Piper-Cub monoplanes of the airport. With Fischer in the back seat of his plane, Badger had flown around the area and then returned to the field, where he had performed, once, a maneuver substantially the same as the maneuver later, in the course of that evening, three times performed by Fischer's plane. There were these differences—Badger dove down from a height of about 600 feet to a low point of 200 feet from the ground and then made a sharp climbing turn, peeling off to the left and rising to a height of 600 feet, at which point he cut off the power and made a landing. On the other hand, Fischer's plane started the maneuver at a height of only 300 feet and dove down to a point within 25 feet of the ground. Then, instead of landing after going through that maneuver once, it

was put through the maneuver three times. At the end of the third time the plane crashed. Obviously, whoever was handling the plane was attempting to perform three times in succession substantially the same maneuver which a few hours earlier had been · demonstrated to Fischer by his friend, Badger.

After the accident Fischer's plane was examined. No structural failure was found.

It will be difficult to find any reported case in which proof of identity by circumstantial evidence is as complete and as convincing as it was in the case before us. Furthermore, no evidence to contradict or weaken the evidence produced by plaintiff was offered by defendant.

As to negligence, and proof by circumstantial evidence as to who was in *exclusive* control of the plane, the trial judge charged:

"This case . . . is based upon a claim for the recovery of damages resulting from an accident which · the plaintiff contends was caused by the negligence, and solely by the negligence, of A. Karl Fischer.

"Negligence is a failure to use the care, caution and diligence that a reasonably prudent person would have exercised under the same circumstances.

"Before the plaintiff can recover, it is necessary that the plaintiff establish that the accident was caused by negligence on the part of A. Karl Fischer, and that there was no negligence on the part of Schumacher which contributed in any way to the accident.

"The burden of proof is, of course, upon the plaintiff.

"It has been said to you by counsel for both sides that the important question in this case is: Who was flying the plane at the time of this accident?

"The proof offered by the plaintiff is what is known as circumstantial evidence. The law is, it is not enough to show merely that an accident occurred, or that it might have happened from any of several causes

equally probable, for only one of which the defendant would be responsible. A jury cannot be allowed to find a verdict on the basis of mere guess or conjecture. Before plaintiff can recover there must be proof of facts and circumstances sufficient to establish as the only reasonable inference the conclusion that Fischer *was in exclusive control* of the plane at the time it crashed, that he was operating it negligently, and that it was his negligence which caused the plane to crash, causing the death of Schumacher.

"It has been said to you, and correctly, I think by counsel for both parties, that there are cases in which circumstantial evidence is so convincing it is as good and as strong as direct evidence would be. I think both counsel agree that the man mentioned in the illustration who goes to bed at night with the streets all clear, and wakes after a sound sleep to find that they are covered with snow, is justified in concluding firmly in his own mind that it has snowed during the night.

"Let me give you another illustration. Suppose you passed a room which had only one door, and as you passed, you saw in the room just two persons and a piano, and one of the persons you saw was a great piano virtuoso—a man, let us say, like Jose Iturbi. The other man you knew to be only a beginner, a student in the elementary stages of learning to play the piano. Just after you passed the door you heard coming from that room a bold, assured performance of a difficult piano composition, let us say something like a Beethoven sonata. Perhaps you would be justified, under such circumstances, in reaching a firm conclusion that the person who played that sonata in that room was the virtuoso and not the beginner.

"That is a case of circumstantial evidence, and yet you may probably conclude that a case of that kind would be just as convincing as if you had actually seen the man playing.

"The law further states when a claim is based upon circumstantial evidence it is necessary that the circumstances which support it, when viewed as a whole, reasonably exclude by their preponderating probative weight any other explanation founded upon the evidence. The conclusion must be established to the exclusion of any other reasonable theory, rather than merely by a probability."

At the conclusion of the charge, counsel were specifically asked by the trial judge, "Have I overlooked anything, or is there any error I have made?"

Counsel for defendant requested that the trial judge bring the "piano illustration . . . closer to this case" and then added:

"Your Honor said to the jury that if there were two people in there, one of whom was an expert at the piano, and the other not, and you walked away and you heard the piano playing, it would naturally be circumstantial—*and I agree with you*—proof that the good piano player was the one who was playing. (Italics supplied.) Let us bring it down to this case. Here are two men in a room, equally able in the matter of playing a piano. You walk past and you hear one of them play. I ask you to say to the jury that if that is the situation, you couldn't tell which one was playing."

The trial judge replied: "I will tell that to the jury, but I also say to the jury that there is absolutely no evidence that Schumacher and Fischer had equal experience as flyers. The one man was a novice flyer, who only had a learner's permit. The other man was an instructor."

Counsel asked for "an exception to that construction." *Otherwise, no exception was taken to the charge and the court was not requested in any way to enlarge upon it.*

Obviously, the piano illustration given by the trial judge would have been just as sound, even if the two men had had equal ability and experience, if one, like Fischer, had had a heavy touch and a dashing, abrupt, bravura style and the other, like Schumacher, had had a gentle, even touch and a style notable for delicate shadings. So, on either ground,—skill and experience or style and manner,—the playing of the one pianist in the illustration, although unseen, could readily have been distinguished from that of the other. Likewise, on either of those grounds, Fischer's handling of the plane could be identified and distinguished from that of Schumacher.

In Flick et al. v. Shimer, Admrx., 340 Pa. 481 (1941), in an opinion by Mr. Justice Maxey, the verdict and judgments for plaintiffs were sustained on the basis of circumstantial evidence, and it seems to us that in the case before us the evidence is even more complete and convincing than that in the Shimer case. Shimer owned a small truck and offered to drive Edward Flick and his brother to a nearby town in order to get some furniture. The three men occupied the only seat in the truck, with Shimer driving at the time they set out for the town 24 miles away. After loading the furniture on the truck, they left for the return trip. *There was no evidence to establish who was behind the steering wheel at that time.* There was evidence to show that the truck, while traveling on the wrong side of a narrow highway at a speed of 60 miles per hour, while rounding a curve to the right, shot across the road to the right and struck two telephone poles. All three men were killed. There was nothing in the position in which the bodies were found to indicate who had been driving. The opinion states (p. 484):

"There *were* sufficient facts in this case to submit to the jury on the main issue which is whether or not

William K. Shimer, the decedent, was driving the truck at the time of the accident. It was *his* truck and *he* knew how to drive it. There is no evidence that the other occupants had driven trucks or cars within recent years or possessed driver's licenses. Shimer was slightly younger than the younger of the two men who accompanied him. It was *he* who volunteered to go and get the furniture. He was at the wheel of the truck when it left on its mission. There is nothing to give rise to an inference that Shimer at any time during the journey relinquished the driving of his own truck to either of his elderly guests. Such things are not customarily done, especially on short journeys."

The opinion then quotes with approval from Wigmore on Evidence as follows (pp. 484-5) :

" 'It is often said that when a person, or object, or relation, or state of things is shown to have existed at a given time, its continuance is presumed. . . . When the existence of an object, condition, quality, or tendency at a given time is in issue, the prior existence of it is in human experience some indication of its probable persistence or continuance at a later period. . . . The opponent, on the principle of *Explanation*, may always attempt to explain away the effect of the evidence by showing that in the meantime other circumstances have occurred to raise a probability of change instead of continuance.' "

It will be noted that, in the case before us, there was no break in continuity such as occurred in the Shimer case. Fischer and Schumacher did not land and get out of the plane after a 15-minute flight. And they did not get back into the airplane without anyone seeing who was handling the controls when they again started off. Also, in the Shimer case, Shimer was not bound by any agreement not to let anyone drive his truck. In addition, there was no testimony to show that Shimer had a characteristic style of driving that,

at the time of the crash, the truck was being driven in Shimer's characteristic style, or that it started around the curve in the manner he habitually followed. Nor was there any evidence that Shimer was known to be interested in rounding that curve at high speed, or that he had had such action demonstrated to him only a few hours before the accident by the driver of another truck. Furthermore, bearing on defendant's suggestion that Schumacher *might have* grabbed the stick in the plane and given it a pull, it would have been just as possible in the Shimer case for the occupant of the truck, seated next to the driver, to have grabbed the wheel and given it a pull just as the truck rounded the curve. The evidence showed that the truck, driven at high speed, was on the left or wrong side of a narrow highway as it approached the curve, that the driver was struggling to swing it over to the right of the road and around the curve to the right, and that the effort succeeded too well, causing the truck to dash off the road *to the right*. However, the mere fact that such action by the man seated next to the driver was *possible* was not sufficient to overcome the sound, reasonable conclusions drawn by the jury from the evidence as a whole. A convincing continuity having been established, the burden was on defendant to show that it had been broken.

That rule has been firmly established in Pennsylvania by a long line of decisions. In Oller v. Bonebrake, 65 Pa. 338, 344 (1870), Mr. Justice Sharswood said:

"The rule is a general and reasonable one that things shown once to have existed must be presumed to continue in that state until the contrary is established by evidence either direct or presumptive." See also Com. v. Fragassa, 278 Pa. 1, 5 (1923), Brennan et al. v. Pine Hill Collieries Co. et al., 312 Pa. 52, 56 (1933), and Zuback v. Bakmaz, 346 Pa. 279, 282 (1943).

Although Mr. Justice Maxey's opinion states that one of the witnesses "saw *the driver* of the truck 'cutting right across the road' near a bend in it" (italics supplied), the notes of testimony in the printed record on appeal show that the witness was merely talking about what happened *to the truck*, and not attempting to say what he saw the driver do as distinguished from the actions of the truck itself. He was asked: "Did you notice the place *where the car was driving?*" The witness answered: "*He* was cutting right across the road at me. There is a bend in the road there." A little later, the same witness was asked: "What is your best estimate *of the speed this car was travelling* as it was approaching you?" He answered: "I would estimate that *he* was travelling at 60." A few questions later he added, "It is a pretty hard matter to say what speed *a man* is going when *he* is coming toward you. Of course, *he* was going at a terrific rate of speed." (Italics supplied.) It will be noted, therefore, that the witness habitually used the word "he" when what the witness actually meant was the truck itself. There is absolutely no testimony in the Shimer case that one of the other two passengers, whether frightened or merely trying to be helpful, did not grab the wheel as the curve was being rounded. However, the Supreme Court properly held that "the conclusions and tests of every day experience must constantly control the standards of legal logic." The same reasoning applies with at least equal force to the case before us.

"The proof (in negligence cases) may be furnished by circumstances themselves. The test is whether they are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the defendant": Rowles v. Evanuik, 350 Pa. 64, 68 (1944).

" 'It is not necessary for the plaintiff to exclude everything which the ingenuity of counsel may sug-

gest as possibly causing or contributing to the accident'" (p. 542). "'The test is whether the circumstances are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the defendant'": Jones et al. v. Monroe Electric Co., 350 Pa. 539, 543 (1944).

"'Proofs to a degree of absolute certainty are rarely attainable; it is sufficient that they be such as to satisfy reasonable minds.' Nor does the law require the elimination of every possible cause of the accident other than that on which the plaintiff relies, or of all the causes which the ingenuity of counsel may suggest, but only of such other causes, if any, as are fairly suggested by the evidence": Stauffer, Admr., v. Railway Express Agency, Inc., 355 Pa. 24, 26 (1946).

In his brief submitted to this court, defendant stated: "There have been only three cases decided in the appellate courts of this country which bear upon this kind of case." We shall therefore discuss the three cases so cited by defendant.

In Budgett v. Soo Sky Ways Inc., 64 S. D. 243, 266 N. W. 253, there was no proof of negligence and plaintiffs attempted to rely on the doctrine of res ipsa loquitur. Two licensed pilots as prospective purchasers got into the front cockpit of a two cockpit plane, and defendant's pilot got into the rear cockpit in order to take them up and demonstrate the plane. The dual controls were hooked up when they started and the plane took off under the control of defendant's pilot. It made a few normal turns around the field. Then, in making another such turn, it suddenly stalled and crashed. There was no evidence as to why it did so. Plaintiff introduced in evidence an air regulation that "the controls shall be so constructed or arranged as to prevent passenger . . . from interfering with the course of flight . . ."

The front cockpit, in which the two passengers were tightly wedged, was only 31 inches wide and the control stick in that cockpit stuck up between them. Both of the two passengers were dressed in heavy flying suits. They were so crowded into the exceedingly narrow seat that the court said: "It does not seem that, so seated, they could have avoided coming in contact with the said stick."

Plaintiff claimed that, in using the ship so hooked up, defendant violated the regulations and was negligent and that such negligence caused the accident. Defendant claimed that the two pilots, who were riding as passengers, were negligent in riding as such under improper and unsafe conditions which were obvious to them.

The court quite evidently missed the real point in the case. It discussed the possibility that one of the two passenger pilots might have taken hold of the stick and turned the nose of the ship towards the ground and thus caused the accident, and also the possibility that the pilot might have pulled the stick under his control the wrong way. It completely overlooked the most obvious and probable cause of the accident—that the forward stick became momentarily wedged between the two men crowded with heavy clothing into an exceedingly narrow seat and that, therefore, the pilot in the rear lost that instant and delicate control which was necessary for safe flying.

Under such facts, the court properly held that plaintiff had failed to sustain the burden of proof. That seems to have been a very sound conclusion, but also one which in no way affects the case now before us.

In Michigan Aero Club v. Shelley, 283 Mich. 401, 278 N. W. 121 (1938), the facts were substantially as follows: Suit was brought by the club against the administrator of the estate of Leo F. Hickey, who had been a member, for damages for the loss of one of the club's

airplanes. Hickey held a private pilot's license. On the day of the accident he took up with him in the plane a young man employed as a skilled aircraft mechanic, named Madyck, who held an amateur pilot's license and owned a private plane. "No witness saw the plane take off." Therefore, there was no proof as to who was in control at the start of their short flight. Another member of the club had made a flight in the plane shortly before these two men took it up, and he testified that "when he returned from his flight the dual controls in the plane were not connected." Between that time "and the time of the crash, someone connected the dual controls on the plane." That gave rise to an inference that Hickey and Madyck had connected the controls before taking off for the purpose of permitting operation from the rear cockpit during their flight. That inference was strengthened by the fact both men had equal skill, and during their flight they indulged in a series of aerobatic maneuvers. Also, "there was testimony which might indicate the engine was faulty just before the crash." Furthermore, "the testimony was just as consistent with the fact the damage was caused by a forced landing as with the contention it was caused by a flight at low altitude; and the court, on the testimony, could only conjecture the cause of the crash."

"If there was any presumption from the fact Hickey obtained the plane that he was operating it, that presumption disappeared in the face of the proof Madyck was in the rear cockpit, the dual controls connected, a stick present, Madyck a pilot, *and that the dual controls were connected immediately prior to the flight in question.*" (Italics supplied.)

Furthermore, there was no proof that the plane at the time of the crash was being flown in the characteristic style of one pilot and not in that of the other. It was not even shown that their flying styles were

different in any way. It was under these conditions that the court held: "There is no more probability the accident was caused by the negligence of Hickey than there is it was caused by the negligence of Madyck." That was obviously a sound conclusion.

In Towle v. Phillips, 180 Tenn. 121 (1943), the two men were riding in an airplane which had just been bought by a man named Webb. He took several friends up for a ride. The first two trips were made safely. Then he asked Towle to go with him on the third trip. The plane got up all right and, after flying a short distance, returned and circled around the field at a low altitude. Then it seemed to go straight up and stalled and fell to the ground. Both occupants were instantly killed. The plane had dual controls, one before each seat. As Webb did not have exclusive control, the court ruled that the doctrine of res ipsa loquitur could not be applied. (But it should be noted that it was neither applied nor invoked in the case now before us, in which the negligence that caused the crash was clearly proven.) The court cites a decision holding "that in the present state of aircraft development the doctrine of *res ipsa loquitur* could not be applied to the fall of an airplane *when it was common knowledge that it fell from causes over which the pilot had no control.*" (Italics supplied.) The court further pointed out that all the specifications of negligence set out in plaintiff's declaration were based on the proposition that Webb was attempting aerobatics, and then said: "There is no evidence that Webb was attempting anything of the kind unless such an inference can be drawn from the climb itself." The court further stated:

"Webb had taken two other friends for a ride before he took Towle. He attempted no aerobatics or stunts on these flights, manifested no disposition to show off his airplane. When circling back over the

field at a low altitude, it is possible that he intended to land."

In our case there was undisputed evidence of the performance of aerobatics of a violent nature under conditions involving great risk, and also of Fischer's eagerness and disposition to show off his airplane in stunt flying. The court further said that the crash "may have been caused by something not explained, for which neither man was responsible." That statement could certainly not have been made in the present case where the proof of gross negligence in the operation of the plane was not even challenged.

The point is that the evidence in the three cases cited clearly made it impossible to determine with reasonable certainty *either* what caused the accident, *or* who was responsible for it. In the case before us, there was definite and ample proof as to both of those matters. Plaintiff's evidence fully sustained the findings of the jury that (in the language of the charge) "Fischer was in *exclusive* control of the plane at the time it crashed; . . . that the accident was caused by negligence on the part of Fischer; and that there was no negligence on the part of Schumacher which contributed in any way to the accident." As defendant rested without offering evidence, he therefore failed (1) to sustain the burden which rested upon him under such circumstances to prove, if he wished so to contend, that Schumacher was either wholly or in part responsible for the accident; (2) to overcome the well recognized rule that, the status of operation of the plane by Fischer having been established by direct testimony, it "must be presumed to continue . . . until the contrary is established by evidence" (Oller v. Bonebrake and other cases hereinbefore cited), and (3) to overcome the presumption that Schumacher, like any other person killed in an accident, used due care, which presumption arises "from the general knowledge of

the strength of the instinct of self-preservation and the natural desire to avoid pain and injury to oneself": Rowles v. Evanuik, 350 Pa. 64, 69 (1944). The notes of testimony are studded with exceptions taken by defendant. Most of them were taken with respect to evidence tending to identify who was in control of the plane at the time it performed the maneuvers ending in the crash. It is well established that a defendant even in a first-degree murder case can be identified by a characteristic, distinctive manner of doing such simple things as walking, writing, or speaking. Professionals of all kinds, and even individuals lacking expertness, can be recognized by their characteristic styles of performance, almost as readily as by their appearances. We can see nothing objectionable in evidence which showed that Fischer had an easily recognizable, bold, assured, abrupt style of flying, with a heavy hand on the controls, and that Schumacher's flying style was exceptionally smooth and conservative, marked by gentle turns and a light hand. The jury was thereby enabled to compare the flying styles of the two men with the style in which the plane was being flown at the time of the crash, as described by competent eyewitnesses. Defendant contends that this evidence was "character evidence" and that "character must be shown by reputation". That contention is without merit. There was no attempt at any time to prove Fischer's character. It was quite immaterial whether it was good or bad. Obviously, for the purpose of identifying an unseen individual by recognition of his unusual voice and manner of speaking, the best evidence would not be his reputation as a speaker, but the direct testimony of persons who had heard the voice and the speaking, and had previously many, many times heard the individual speak.

In this case, this particular line of testimony was exceptionally convincing. First, because the identifica-

tion was narrowed down to two men; secondly, because their flying styles were strikingly different, one from the other, and thirdly, because the testimony was given by well-qualified witnesses thoroughly familiar with the respective flying styles of both Fischer and Schumacher.

The rule of admissibility is stated in 31 C. J. S. 878, as follows: "Any fact, however slight, which tends to satisfy a person of ordinary judgment as to identity is admissible on the issue."

Defendant also objected to all the evidence which showed that Fischer was a skilled, professional pilot; that Schumacher was a novice, holding only a learner's permit and having had a total of only 14 hours flying experience; that the maneuver, which ended in the crash and was performed three times with brilliant assurance and dash, was one which only a pilot of considerable skill and experience could have performed in that manner; that Fischer had had the requisite skill and experience so to perfrom it, and that Schumacher had not. We can see no sound basis for the objections to such evidence, given as it was by well-qualified experts.

Defendant further misconstrued the purpose of certain of the evidence given to prove the identity of the operator of the plane, and mistakenly objected to it on the ground that plaintiff was thereby seeking to prove negligence by proof of prior acts of negligence. But the negligence at the time of the crash was proven directly by the testimony of eyewitnesses. It was virtually admitted. The testimony so objected to by defendant was *not* even directed to that issue. It was offered, along with other evidence, solely to establish the identity of the person who was flying the plane.

Plaintiff in no instance attempted to raise any inference that Fischer was *negligent* on June 29, 1946, on the ground that he had been *negligent* prior to that

date. Nor did plaintiff attempt to reconstruct the manner in which the accident occurred from Fischer's prior conduct. None of the testimony objected to was intended to prove, nor did it tend to prove, that Fischer was negligent. There is nothing negligent per se in aerobatics if they are performed at safe altitude. There is no imputation of wrong of any kind in planning to engage in aerobatics. There was no negligence shown in Fischer's prior aerobatic experience. He had always tried such maneuvers at a safe altitude. He had never had an accident. There is nothing illegal or disreputable about owning an airplane adapted to aerobatic flying and there is no reason at all why a person should not fly in an abrupt rather than in a smooth manner if he wants to.

The fact that, just preceding the maneuvers which ended in the crash, the plane entered the traffic pattern of the field with a sharp, abrupt turn to the right, instead of a smooth, gentle turn to the prescribed left, did not prove negligence. There were no other planes then entering the pattern. Furthermore, it did not contribute in the slightest degree to the accident. It was merely one of many characteristic gestures serving to identify who was handling the plane.

The fact that Fischer had a highly distinctive, abrupt and dashing style of flight did not show that he was negligent, either on other occasions or on the day of the fatal crash. *The style in which the plane was climbed and turned*—whether abrupt or smooth—*had no bearing on the crash.* A plane can enter a climb either sharply or with slow and deliberate precision. Regardless of how the pilot initiates the maneuver, if he allows the plane to remain in a steep climbing position too long it will lose flying speed and stall. If he makes that mistake at a proper altitude, he has space below him in which readily to recover control and no harm is done. He cannot even be said to have

been negligent. *The performance of the difficult maneuvers*, with their extreme altitudes and speed, *within 25 to 300 feet of the ground was the recklessness complained of, and not the style in which they were performed.* The style merely helped further to identify who was at the controls.

Again, the fact that Fischer planned to fly aerobatically did not brand him as a bad man nor tend in the slightest to prove that he was a negligent person or that he was negligent on this occasion. The evidence of such plan was advanced, along with other evidence, merely to show that Fischer was flying when the aerobatic maneuvers were performed. It had nothing to do with whether such maneuvers were performed properly or improperly.

Defendant even objected to the testimony of an eyewitness that, when the plane was started, Schumacher's hands were holding onto the sides of the plane. We cannot see any possible valid reason for that objection.

Defendant objected to the introduction in evidence of the log book kept by Schumacher. It was an official document required by law to be kept by him. It was a record kept in the regular course of business by Schumacher who is now deceased. As Schumacher had to show a certain amount of flying experience in order to be eligible to obtain a pilot's license, it may be inferred that he had no motive for showing in his book any *less* experience than he actually had. Furthermore, counsel for defendant, after noting his objection, made use of Schumacher's log book in his cross-examination of Hughes, in an effort to show facts favorable to defendant.

Defendant also objected that plaintiff's chief witness, William A. Hughes, was not an instructor and had not been for some years, and therefore was not qualified to pass upon the skill of a student pilot. It

would be difficult to find an expert witness better qualified than Hughes. He learned to fly in World War I in 1917 and had been flying ever since, a total to the date of trial of 31 years. After World War I he was a barnstormer. He had also been an airmail pilot and for many years an instructor. During the last war, he was an instructor of the Canadian Royal Air Force. He had given thousands of hours of instruction both in the Army and to civilians. When the United States entered World War II, he became Chief Production Test Pilot for the Brewster Aviation Corporation, which was making dive bombers and Corsairs for the Navy. After the war ended, he became coowner and operator of the Doylestown air service. At the date of the trial he had had approximately 15,900 hours of flying. In the course of his experience, he had done practically everything in the flying business, straight and level flying, aerobatics and cross country flying, night flying, test flying— every kind of flying involved in aviation. As operations manager, he was in charge of student instruction, as well as other activities, at the Doylestown Airport.

Furthermore, the question at issue was Schumacher's skill *as a pilot*—not as a student pilot. Could he, with the degree of skill he had, have put a plane through the maneuvers, which ended with the crash, in the assured competent manner in which, down to the last moment, they were performed?

Defendant further objected to the evidence as to Schumacher's lack of flying experience on the ground that it was in part negative testimony, as for example the testimony by the instructors and the manager at the airport that Schumacher had never requested any instruction in aerobatics and that they had never seen him attempt to perform any aerobatic maneuvers. But Schumacher's log book shows that, on the three occasions when he had short flights at Port Erie, the flight

was entered and was then attested to by the instructor. It may be inferred that, if Schumacher had ever flown on any occasions not reported in his book, his self-interest in running up entries sufficient to enable him some day to obtain a pilot's license would have caused him to enter such additional flights. Consequently, as virtually all his short flying experience had been over the airfield at Doylestown, the testimony of the instructors and the manager at that field, who had either been with him in the plane or observing him from the ground, was complete and convincing. The most any man could say, even if he had watched Schumacher every moment he was in the air, was that he had never seen Schumacher attempt any aerobatic maneuver. If, in fact, Schumacher had ever done any such flying, or had had experience beyond that noted in his log book, the defendant had full opportunity to offer testimony to that effect.

Likewise, defendant objected that the testimony as to Fischer's manner of flying was based on observations of how "he *sometimes* flew an airplane". One of the witnesses had observed Fischer's flying on approximately 100 occasions. Another had observed it between 75 and 100 times. Those men were experts who had devoted their lives to flying and to instructing others in the art of flying. It seems incredible that defendant should attempt so lightly to brush aside such competent testimony.

We do not think it necessary to cover specifically each of the many exceptions taken by defendant or to answer defendant's contention that the trial judge failed to subject the evidence to critical tests. The sole question in that regard is whether the trial judge committed any reversible error. We do not think he did. Defendant rightly states in his brief that this was a difficult case, one which both plaintiff and defendant found difficult notwithstanding the fact that, from

the date the complaint was filed until trial, they had had almost a year in which to perfect their preparations. Defendant seems to overlook the fact that circumstantial evidence usually depends upon a number of items, all pointing to the same conclusion, although anyone of them standing alone might well be deemed inadequate. It is only after such a case has been developed that each particular piece of evidence may be weighed accurately in its relation to the whole. So weighed, we think all of the evidence was properly admitted.

Defendant claims that the verdict was excessive. We are of the opinion that the amount awarded was too small rather than too large. Schumacher was only 35½ years of age and his life expectancy according to the tables was 31 years. He was a vigorous, family man in excellent health, leading a clean, healthy life. At the end of 31 years he would have been only 67— an early age at which to die for a man of his type. Schumacher's employment was not hazardous, and we do not find that such occasional, conservative flying as he would have done would have constituted any greater hazard than the driving of automobiles constitutes for the average conservative and responsible citizen. The accident which caused his death was in no way due to any normal hazard of flying. It was the result of gross negligence, perhaps wanton recklessness, on the part of a skilled professional pilot. Accidents caused by the negligence of someone else can happen at any time to the most cautious person, whether on the ground or in the air. We may assume that that factor was given due consideration in the preparation of the tables covering life expectancy.

Schumacher was earning $7,500 per year. He was well liked by the company which employed him. It was engaged in a modern business with an assured future. His services were exceptionally satisfactory

and he had just been made a director and an officer of the company. For a substantial period of years, 20 to 25, he could reasonably have looked forward to an increasing annual income. According to the present value tables used by the Penn Mutual Life Insurance Co. (not offered in evidence, but nonetheless of value to the court in determining whether the verdict was excessive), it would require a present payment of $67,374.50 (as contrasted with the $65,000 awarded by the jury) to provide at six percent a net income of $4,700 per year for 31 years. Our own opinion is that Schumacher's annual net income at the time of his death, over and above his own maintenance, was greater than $4,700, and more nearly $6,000 per year, based on his $7,500 gross. We also think he had a life expectancy of approximately 35 years, and that he would have earned net, over and above his own maintenance, $8,000 or more for most of that period. We regard the $65,000 awarded as reasonable and modest.

For the reasons stated, we dismissed defendant's rules for judgment n. o. v. and for new trial.

## DISSENTING OPINION

CRUMLISH, J., February, 1949.—I cannot bring myself to agree with my brethren.

The main question is whether or not the motion for judgment n. o. v. should be granted. I shall, however, touch upon certain reasons which I think could support the granting of the motion for a new trial because of the close relationship between them and my reasons for voting to grant the motion for judgment n. o. v.

### *New Trial*

1. I think it was error to admit in evidence, over objections:

A. The conversation which took place between Fischer, defendant's decedent, and W. A. Hughes, plaintiff's witness, shortly after the former had pur-

chased the Kinner Fleet airplane. The witness Hughes testified that Fischer said he had "bought the plane to see if he could learn to do aerobatics." This testimony was too remote and irrelevant.

B. The Federal regulations. The flight was intrastate and the applicable statute was The Aeronautical Code of May 25, 1933, P. L. 1001, sec. 406, 2 PS §1472. The Federal regulations, therefore, were irrelevant.

C. Testimony regarding Fischer's misconduct on previous occasions. For example, the witness Hughes testified that Fischer inexpertly performed slow rolls and snap rolls, cut corners, cut off other ships, landed inside the slip ahead of him, and ignored the traffic pattern; plaintiff's witness Drohan testified that he had seen Fischer ". . . enter the pattern, many a time, the wrong way. I have seen him disregard other students who were flying solo in the pattern, or myself, in the pattern, come in, make sharp turns into the pattern and cut us all off, come in and land, which made it very dangerous for students flying around there alone." Testimony of this type is indicative not merely of style, but rather of specific acts of misconduct. "It is an established rule applicable alike to civil and criminal inquiries that the commission of the act charged cannot be proved by showing a like act to have been committed by the same person." See Baker v. Irish, 172 Pa. 528, 532 (1896), Veit v. Class and Nachod Brewing Company, 216 Pa. 29, 33 (1906), Wyatt v. Russell, 308 Pa. 366, 369 (1932), Artman v. Stanford, 93 Pa. Superior Ct. 287 (1928), and Seaman, Adm., v. Curtiss Flying Service, Inc., 247 N. Y. S., 251, 253 (1930).

D. Hughes' testimony regarding Fischer's flight in an AT-6 earlier in the day of the accident with one Badger, who performed, in the course of the flight, a maneuver "substantially" the same as that being per-

formed at the time of the crash. This testimony was vague, argumentative, and immaterial.

The admission of the above-mentioned testimony (A, B, C, and D) had the effect (particularly since there was no proof that Fischer had ever performed the precise maneuver which was being attempted at the time of the accident) of confusing and prejudicing the jury.

*Motion for Judgment N. O. V.*

A. *Circumstantial Evidence.*

To me the evidence, viewed in the light most favorable to plaintiff, discloses:

1. Defendant's decedent Fischer was the owner of the plane involved in the accident.

2. Fischer was an experienced flyer whose manner of flying was very abrupt, inexpert, and sharp sometimes. At other times his style was conservative.

3. Plaintiff's decedent was a less experienced flyer, a student, ". . . normal, like every student; with the little time he put in, he did a good job." "He . . . just came right along, the way every student should." He was conservative and cautious while being observed by the witness Mr. Drohan. He had about three and one-half hours' solo flying to his credit. He had never been seen operating a Kinner Fleet but had been seen operating a Piper Cub solo about five times.

4. The Kinner Fleet was a dual-controlled plane, and Fischer was in control when it took off. It was being operated in a dangerous manner immediately prior to and at the time of the crash. The plane entered the airport contrary to the traffic pattern and dived too close to the ground at too high a speed. Either a reckless maneuver or an attempt to land was being performed unsuccessfully because of lack of skill or care or because of some other unknown factor.

From the above I cannot conclude that the testimony was reasonably subject to the inference that

the plane was being operated at the time of the crash by Fischer alone. I cannot agree that the circumstantial evidence was "so complete and convincing that it left no room for reasonable doubt."

" '. . . in a *civil* case the evidence of facts and circumstances on which plaintiff relies and the inferences logically deducible therefrom, must so preponderate in favor of the basic proposition he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition' ": Polk v. Steel Workers Organizing Committee et al., 360 Pa. 631, 634 (1948), quoting DeReeder v. Travelers Insurance Company, 329 Pa. 328, 334 (1938). The "circumstantial evidence" relied on in the present case is merely evidence of "sharp," "abrupt," inconsistent, and inexpert flying on other occasions. As noted above, under the authority of the line of cases headed by Baker v. Irish, supra, evidence of the habit Fischer had of sometimes disregarding the traffic pattern upon entering the field and sometimes "for some unknown reason . . . breaking rules," etc., should not have been admitted. I shall consider it here, however, as being in the nature of circumstantial evidence. See Cherry v. Mitosky, 353 Pa. 401, 404 (1946). Even considered as such, the illustrations suggested as applicable in weighing the evidence are not self-sustaining. For example, the Jose Iturbi analogy loses some of its force when the following factors are considered: (1) Senor Iturbi's ability as a piano virtuoso is above the level in his field; according to the testimony in this case, Fischer's ability was below the level in his field; (2) the visual acuteness and discerning ability of the observer must be comparable, in the case of Fischer, to the musical sense and ear of the hearer in the Iturbi illustration; (3) usually, playing the piano is an art that takes practice, training, and ability with many years of study; flying an airplane is a skill that can be acquired

in a relatively short time, according to the testimony; therefore, if a student has bravado and a natural aptitude, he can quickly rise to the level of a competent pilot.

The fact that the plane had dual controls, that is, control equipment in the front same as in the rear (the stipulation of counsel was that " . . . it is physically possible to operate the plane here involved from either the front or rear cockpit"), must be kept uppermost in mind when considering the question of control at the time of the crash. If it were not for this fact, the reasoning of Flick et al. v. Shimer, Admx., 340 Pa. 481 (1941), cited by plaintiff, would be very persuasive. In that case, there were no dual controls; neither of the two passengers had a driver's license, neither had the inclination to drive, and neither had driven in recent years. These facts made the evidence of ownership and the proof of defendant's decedent's volunteering to take the others for a ride pertinent. The court, in the Flick case, quoted Wigmore for the following proposition: "The conclusions and tests of every day experience must constantly control the standards of legal logic." Here these conclusions and tests do not eliminate the possibility that a student flyer could interfere with the control of his veteran companion. In all examined cases of dual-controlled planes, where both persons in the plane could fly, the presumption of continued control from the front cockpit has not been allowed. Conceding, arguendo, the majority opinion's theory that Schumacher did not have sufficient training and skill to maneuver the plane as it was being maneuvered in the fatal crash, we still have the very strong probability that Schumacher had his hand on the dual control in the rear cockpit while the maneuver was being attempted and interfered with the control to such an extent that a crash resulted.

In those jurisdictions where res ipsa loquitur applies, the doctrine has been held inapplicable to cases of dual-controlled airplanes because there is no proof of exclusive control. In Parker et al. v. Granger, 4 Cal.(2d) 668, 52 P. (2d) 226 (1935), defendant owner rented two dual-controlled airplanes to a film company. The planes were piloted by defendant's licensed pilots. There was evidence that two members of the film company group riding in the plane were to sit behind the dual controls of each plane and "wiggle" the wings as a signal to turn. There was a crash between the planes and it was held that these facts warranted a finding that defendants were not in exclusive control of the planes.

The Supreme Court of South Dakota in Budgett v. Soo Sky Ways, Inc., 64 S. D. 243, 266 N. W. 253 (1936), in deciding that the doctrine could not be invoked in a case where plaintiff's decedent, Budgett, and one Schmidt, prospective buyers, accompanied defendant's agent, Hollister, in a dual controlled plane on a ride which ended in a crash fatal to the prospective buyers said:

"It is possible that either Schmidt or Budgett may have taken hold of the stick and moved it in such a way as to have turned the nose of the ship toward the ground, and in that way caused the crash; but there is no evidence that either of them did anything of the kind. On the other hand, the pilot may have made a false move and pulled the stick the wrong way, or he may have made too short a turn or too steep a bank and lost flying speed of the ship, and for that reason it fell to the ground . . . appellant invokes the doctrine of res ipsa loquitur, which, as applied to this case, means that the state of the evidence and the surrounding circumstances were such that the accident could not have happened except through negligence on the part of the pilot. . . . But that doctrine cannot be applied in this

case, because there is no more probability that the accident was caused by negligence on the part of the defendant than on the part of Budgett or Schmidt."

In Michigan Aero Club v. Shelley, 283 Mich. 401, 278 N. W. 121 (1938), one Hickey, a licensed pilot, a member of defendant club, obtained custody of a club-owned plane equipped with dual controls and took off with one Madyck, an amateur pilot, for a flight which ended in a crash fatal to both. Speaking for the Supreme Court of Michigan, Mr. Justice Potter said:

"There is nothing except guessing and conjecture to indicate that Hickey, rather than Madyck, was negligently operating the plane. . . . There is no presumption the plane was being operated from the front cockpit. There is no presumption that Hickey was acting properly in the face of the proof the plane was being operated in violation of the club, State and Federal rules . . . Hickey was an experienced flyer, 14 years older than Madyck, was an average pilot, the club rules required members of the club obtain permission from the instructor before taking up passengers. It is just as consistent with what happened to claim that Madyck connected the dual controls, operated the plane from the rear cockpit, was engaged in stunt flying to demonstrate his skill and that Hickey permitted him to do so. . . . This is mere conjecture, but it is not inconsistent with what happened. There is no presumption Madyck was not operating the plane. . . . There is no presumption under the admitted facts that Hickey was operating the plane at the time of the crash."

Lastly, Chief Justice Green, of the Supreme Court of Tennessee, in Towle v. Phillips, 180 Tenn. 121, 172 S. W. (2d) 806 (1943), a case where plaintiff's decedent, Towle, was killed along with defendant's decedent, Webb, in a crash which occurred while both were riding in a dual controlled plane owned and initially oper-

ated by defendant's decedent, said, in denying the application of the doctrine of res ipsa loquitur:

"This airplane had dual controls. . . . So it is plain that the course of the machine might have been directed by Towle as well as by Webb. . . . No doubt the vertical climb was the proximate cause of the crash. On the record before us it may have been caused by Webb's handling of the controls available to him, or by Towle's handling of the controls available to him, or it may have been caused by something not explained, for which neither man was responsible. It would be a guess to say that Webb's negligence was the responsible agency."

In distinguishing the Towle case, Judge Oliver concluded that in the instant case "aerobatics of a violent nature were being attempted", but, for all we know, the plane might not have been engaged in a maneuver but may have been out of control, a fact "caused by something not explained for which neither man was responsible." But, assuming that the plane was being operated in a negligent manner at the time of the crash, this assumption becomes immaterial in the absence of proof that Fischer alone was then controlling the operation of the plane.

Under the evidence in the instant case, it is equally plausible: (1) That Fischer was operating the plane from the start of the trip to the time of the crash; (2) that at some time during the course of the flight Fischer turned over the controls to Schumacher, who, because of his lack of experience, operated the plane in an unsafe manner and at an altitude too low to permit the successful completion of a maneuver or an attempt to land; or (3) that Fischer operated the plane during the two successful completions of the maneuver and, on the third attempt, Schumacher interfered with Fischer's control of the plane and this interference resulted in the maneuver's being fatally unsuccessful.

These three plausibilities become more apparent when we consider: (1) The testimony of plaintiff's expert witness Hughes describing "the course of dual instruction"; (2) the fact that Fischer had the rank of instructor and Schumacher the rating of student pilot; (3) the fact that Schumacher and Fischer had spent some time together and had dined with each other at Doylestown before embarking on the fatal flight; (4) the fact that Fischer, although prohibited by contract from giving lessons in his own plane at the Doylestown Airport, was the type who had committed gross violations of traffic patterns and airport rules and regulations; (5) the fact that Fischer's plane was equipped with dual controls, making changes of or interference with control while in flight possible. Taking all these circumstances into consideration, it cannot be said with any certainty either that Fischer and Schumacher set out and continued as pilot and guest, respectively, until the time of the fatal crash, or that, having started out as pilot, Fischer proceeded to give instructions to Schumacher who, during the course of the instructions, shared control and was interfering with the control of Fischer at the time of the accident. The evidence, at best, is sufficient only to create a suspicion that Fischer alone and without any interference by Schumacher was operating the plane immediately before and at the time of the crash or to give the jury basis for a guess that such was the fact. The rule applicable is, I believe, clearly stated in Kniess v. Badolato, 343 Pa. 213 (1941), at page 218:

"The inference sought to be drawn . . . collides with other inferences at least equally as plausible and, under these circumstances, he was not entitled to submit his case to the jury."

In the case before us there were three possibilities fairly suggested by the evidence and the burden was on plaintiff to show that defendant was liable to the

exclusion of all other causes: Erbe v. Philadelphia Rapid Transit Company, 256 Pa. 567, 570 (1917); Polk v. Steel Workers Organizing Committee et al., supra, and cases there cited.

It must be remembered that here is not a question of how an accident occurred but rather of who was in control. Cases, therefore, like Tucker v. Pittsburg, Cincinnati, Chicago & St. Louis Railway Co., 227 Pa. 66, 68 (1910), dealing with circumstantial evidence, and Bauer, admx., v. Sacks, 355 Pa. 488, 491 (1947), and Kasanovich, admx., v. George et al., 348 Pa. 199, 202 (1943), dealing with the question of wanton misconduct and contributory negligence, are not controlling here, for here not the cause of the injury is at issue but the identity of the tortfeasor. Also distinguishable are cases dealing with identification by physical characteristics, e.g., Brown v. Commonwealth, 76 Pa. 319, 338 (1874). Physical characteristics like voice, gait, and handwriting are frequently used for the purpose of identification on the testimony of either an expert or one familiar with the subject being identified. But whether expert by training or familiar by association, the witness should be testifying to a characteristic which is far enough from the standard to have some probative force. Here there was testimony that the plane was being flown in an abrupt manner. Fischer was wont to fly, sometimes, in an abrupt manner. The adjective, allowing for the experience of the two witnesses and the difference in training and skill of the two flyers, does not have much definitive value. Besides the fact that the plane was being flown in an abrupt manner, the only factor which would tend to identify Fischer was that the "maneuver" required skill; in the opinion of the expert witnesses, Fischer had the skill and Schumacher did not. Apparently there was not enough skill to complete the maneuver.

## B. *Presumptions.*

First will be considered the presumption of continued control. The majority opinion relies upon Oller v. Bonebrake, 65 Pa. 338, 344 (1870); Commonwealth v. Fragassa, 278 Pa. 1, 5 (1923); Brennan et al. v. Pine Hill Collieries Co. et al., 312 Pa. 52, 56 (1933), and Zuback v. Bakmaz, 346 Pa. 279, 282 (1943), in support of the proposition that "The rule is a general and reasonable one that things shown to have existed must be presumed to continue in that status until the contrary is established by evidence either direct or presumptive." This proposition, applied to the circumstances of the instant case, would support the position that the fact that Fischer operated the airplane at the beginning of the fatal trip having been established by direct evidence, "it must be presumed to continue . . . until the contrary is established by evidence." In effect, this position gives to the ordinary probability that Fischer would continue in control the force of a fact in evidence, shifting the burden of proof to defendant. Mr. Justice Maxey was very painstaking in Watkins v. Prudential Insurance Company, 315 Pa. 497 (1934), in his analysis of the nature and function of presumptions. At page 504 he said:

"They are either (1) a procedural expedient, or (2) a rule of proof production based upon the comparative availability of material evidence to the respective parties, or (3) a conclusion firmly based upon the generally known results of wide human experience, or (4) a combination of (1) and (3)."

Obviously, this so-called presumption does not fall into any one of these categories. It is on a par with the so-called "presumption against suicide" mentioned in the Watkins case. "It is merely a permissible consideration of the nonprobability" of Fischer's relinquishing control.

The presumption that the owner of a vehicle is in control thereof (Holzheimer et ux. v. Lit Brothers, 262 Pa. 150 (1918) ;. Sieber v. Russ Bros. Ice Cream Co., 276 Pa. 340 (1923)), arises only when the vehicle is a commercial one and bears the owner's name; it will not arise when the car is a privately owned passenger car (Reed v. Bennett et al., 276 Pa. 107, 111 (1923)), and cannot be called upon when a privately owned plane has dual controls.

There remains for final consideration the presumption of the exercise of due care by one killed in an accident. Unless there is evidence of lack of due care on the part of defendant's decedent and there is no competent evidence of such lack on the part of plaintiff's decedent, the presumptions of the due care exercised by both killed in an accident neutralize each other: Johnson v. Hetrick, administratrix, 300 Pa. 225, 229 (1930), and cases there considered. Here, the proof of control is not sufficient to allow the presumption to work either way.

### Supplemental Opinion

OLIVER, P. J., March 11, 1949.—Certain matters raised in the dissenting opinion filed by one member of this court call for a brief reply.

Defendant's motion for a new trial was dismissed by our full court. The judge who has written the dissenting opinion concurred in that action, and signed the order of dismissal on our docket. He dissented solely from the order dismissing defendant's motion for judgment n. o. v.

In dealing with that motion, the dissenting opinion starts with what purports to be a review of *all the circumstantial evidence* as to who was operating the plane when the crash occurred. It states that "the evidence, viewed in the light most favorable to the plaintiff, discloses." However, the summary that follows that phrase, which so correctly sets forth the duty of

the court, covers approximately only a third of the evidence and minimizes that. The force of this comment will appear clearly upon a comparison of the facts making up the circumstantial evidence, as summarized in the opinion of this court and as summarized in the dissenting opinion. The later opinion in its summary of such evidence omits entirely any reference to such important items as the testimony of well qualified experts who stated that the maneuver, which ended in the crash, was one which only a pilot having a high degree of skill and experience could perform; that Fischer had the skill and experience required to perform it; and that Schumacher definitely did not have either such skill or such experience; that Fischer had a very abrupt flying style characterized by sharp, quick maneuvering and rough flying, which style could readily be distinguished from that of any other pilot at the airport; that he habitually entered the traffic pattern of the field with an abrupt right turn, contrary to the field regulations; that Schumacher flew conservatively and entered the traffic pattern consistently with a smooth, gentle turn from the left, in conformity with the regulations; and that this plane, just before the maneuver which ended in the crash, was brought into the traffic pattern in Fischer's bold style, with a sharp, abrupt, right turn. That is only a part of the evidence which was left out of consideration by the dissenting judge. It cannot accurately be stated therefore that he considered "the evidence, viewed in the light most favorable to the plaintiff".

In addition, certain of the reasoning in the dissenting opinion overlooks the fact that negligent operation of the plane was conceded. In fact, the negligence was not only obvious but so gross as to amount to recklessness. What the jury had to decide was merely which of the two men was operating the plane. Plaintiff had to prove that by circumstantial evidence. The dissent-

ing opinion is therefore in error when in certain passages thereof it tests the admissibility of evidence, to establish flying style and characteristics, as though such evidence had been offered to establish that which was conceded, negligence.

Also, the doctrine of res ipsa loquitur was not invoked or applied in this case. The negligence was clearly and directly established by proof so convincing it was not even questioned. Therefore, the discussion of that doctrine and of cases dealing with it is not relevant to the issues which were before us.

All of this is in effect recognized by the dissenting judge when, in another part of his opinion, he states, "It must be remembered that here is not a question of how an accident occurred but rather of who was in control". That, of course, is correct, but it should have been kept in mind consistently, and that, we think, was not done in the drafting of the dissenting opinion.

Finally, the dissenting opinion states that, from the evidence, there are two other inferences which are just as plausible as the inference, drawn by the jury, that Fischer was in exclusive control of the plane during the course of the maneuvers which ended in the crash. The first of these inferences, according to the dissenting opinion, is that "at some time during the course of the flight Fischer turned over the controls to Schumacher, who, because of his lack of experience, operated the plane in an unsafe maneuver and at an altitude too low to permit the successful completion of a maneuver or an attempt to land". We suggest that that inference cannot fairly be drawn *from the evidence, but only by a process of disregarding the evidence*. It fails completely to take into account the testimony that a plane landing is made at slow speed with the engine throttled down, whereas this plane came roaring down to within 25 feet of the ground with its throttle wide open, *at approximately three times its*

*normal landing speed* and did that three times in succession; that clearly the pilot was not attempting to land, but was endeavoring to perform an exceedingly risky and difficult maneuver at a dangerously low altitude; that nonetheless, the pilot had the skill to perform that maneuver three times in succession successfully and brilliantly, and came to grief only when he ascended too sharply after his third effort, causing the plane to stall; that when the plane just prior to those maneuvers had entered the flying pattern of the field, it was flown into that pattern in Fischer's characteristic manner, with an abrupt right turn, and not in Schumacher's style, with a conservative, gentle, left turn; that the maneuvers which followed could have been performed, in the manner in which they were performed, only by a skilled and experienced pilot; that Fischer had the skill and experience to so fly the plane; and that Schumacher, who had nothing more than a learner's permit, did not have it. Obviously, therefore, Fischer was at the controls when the plane came into the field and all through the maneuvers which ended in the crash, just as he was when the plane took off on its short flight, after his announced intention to take Schumacher for a ride.

The *second* alternative inference suggested in the dissenting opinion is "that Fischer operated the plane during the two successful completions of the maneuver and, on the third attempt, Schumacher interfered with Fischer's control of the plane and this interference resulted in the maneuver's being fatally unsuccessful". It takes little imagination to realize that, when a plane roars down to within 25 feet of the ground with its throttle wide open and swoops up, turns sharply and repeats the maneuver, it is a hair-raising experience to anyone either in the plane or on the ground nearby. To infer that a novice seated in the rear cockpit of such a plane, who had just started to learn, and who had

done his few hours of flying in a highly conservative manner, would take over or attempt to take over the controls after two such reckless maneuvers and endeavor to repeat them himself is unjustified and unrealistic. It is infinitely more probable that Schumacher sat huddled in the rear cockpit, with his hair on end, his heart in his mouth and a prayer on his lips. Furthermore, Fischer, having started out on the short flight at the controls and in his own plane, with Schumacher as his guest passenger, the burden was on defendant to show a break in that continuity and that cannot be done by judicial adoption of a mere fantastic possibility which the jury considered and properly rejected.

Likewise, it can no more be inferred in this case that Schumacher at the last moment grabbed the controls than it could have been inferred in the case of Flick et al. v. Shimer, admrx., 340 Pa. 481 (discussed in our original opinion), that the man seated next to Shimer, in a moment of excitement, reached over and grabbed the steering wheel of the truck in a frantic effort to help Shimer negotiate the curve in the roadway. Indeed, even if Schumacher in fright and desperation, caused by Fischer's reckless performance, had grabbed the controls, Fischer would nonetheless be responsible for that consequence of his own reckless conduct. The jury, by its verdict in this case, found that Fischer was in exclusive control of the plane at the time of the accident, that the accident was caused solely by his negligence, and was not contributed to in any way by any negligence on the part of Schumacher. We believe that verdict should not be disturbed.